United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 21, 2004**

Charles R. Fulbruge III
Clerk

Revised July 30, 2004

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-60092

JOPIE EDUARD,

Petitioner,

VERSUS

JOHN ASHCROFT, U.S. ATTORNEY GENERAL,

Respondent.

-------------------------------------------------------------------

consolidated with

No. 03-60093

YULIANA PAKKUNG,

Petitioner,

VERSUS

JOHN ASHCROFT, U.S. ATTORNEY GENERAL,

Respondent.

Petition for Review of an Order of the
Board of Immigration Appeals

Before EMILIO M. GARZA, DeMOSS, and CLEMENT, Circuit Judges.

DeMOSS, Circuit Judge:

Petitioners, citizens of Indonesia, were ordered removed by the Immigration and Naturalization Service ("INS"). The Immigration Judge ("IJ") dismissed their applications for asylum and withholding of removal. The Board of Immigration Appeals ("BIA") affirmed without opinion. Petitioners contend that the IJ erred by denying their applications for asylum. They also assert that the IJ erred by failing to address their claims for relief under the Convention Against Torture ("CAT"). We hold that the IJ committed legal error and therefore reverse and remand for further proceedings not inconsistent with this opinion.

### BACKGROUND

Petitioners Jopie Eduard ("Eduard") and his wife, Yuliana Pakkung ("Pakkung"), are natives and citizens of Indonesia. Pakkung entered the United States in June 1989, as a nonimmigrant visitor, with permission to remain for six months. Eduard entered the United States in June 1991, as a nonimmigrant crewman, with permission to remain for 29 days.

The INS initiated removal proceedings against Pakkung and Eduard in November 2000. Pakkung and Eduard conceded removability, and applied for asylum and withholding of removal.[1]

The IJ held a consolidated hearing on April 23, 2001. The IJ

---

[1]Petitioners each filed an "Application for Asylum and/or Withholding of Removal." Both applications claimed, *inter alia*, that they feared being subject to torture in Indonesia.

2

issued an oral decision denying Eduard's and Pakkung's applications for asylum, and denying withholding of removal pursuant to INA § 241(b)(3)(B). 8 C.F.R. § 208.16(b) (2004). The IJ reasoned that neither applicant had established past persecution or a well-founded fear of future persecution. The IJ did not discuss whether removal could be withheld under the CAT. *Id.* § 208.16(c).

A member of the BIA, acting for the board, affirmed the IJ's decision without opinion. Eduard and Pakkung timely filed this appeal.

### DISCUSSION

Because the BIA summarily affirmed the opinion of the IJ, we review the factual findings and legal conclusions of the IJ. *See Soadjede v. Ashcroft*, 324 F.3d 830, 832 (5th Cir. 2003) (providing that the IJ's decision is the final agency decision if the BIA summarily affirms). We must uphold the IJ's factual findings unless we find that they are not supported by substantial evidence in the record. *Faddoul v. INS*, 37 F.3d 185, 188 (5th Cir. 1994). Substantial evidence is lacking only if the petitioner establishes that the record evidence was "so compelling that no reasonable fact finder could fail to find" the petitioner statutorily eligible for asylum or withholding of removal. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 444 (5th Cir. 2001). We review conclusions of law *de novo*. *Mikhael v. INS*, 115 F.3d 299, 305 (5th Cir. 1997); *Carbajal-Gonzalez v. INS*,

3

78 F.3d 194, 197 (5th Cir. 1996). Consequently, even though we are required to review the factual findings of the IJ for substantial evidence, we nevertheless may reverse an IJ's decision if it was decided on the basis of an erroneous application of the law. *Mikhael,* 115 F.3d at 305.

Petitioners contend that the IJ erred by (1) denying their applications for asylum[2] and (2) failing to address their claims for relief under the CAT.

## I. Whether the IJ erred by denying Petitioners' applications for asylum.

Petitioners first contend that the IJ erred by denying their applications for asylum. The Attorney General is authorized to grant asylum to "refugees." INA § 208(a), 8 U.S.C. § 1158(a) (2004); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987); *Mikhael*, 115 F.3d at 303. A refugee is:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

---

[2]Petitioners do not discuss the IJ's denial of their applications for withholding of removal under INA § 241(b)(3)(B). Withholding of removal requires a higher standard of proof than asylum. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984); *Faddoul v. INS*, 37 F.3d 185, 188 (5th Cir. 1994). This "level of proof . . . is more stringent than for asylum purposes." *Mikhael v. INS*, 115 F.3d 299, 306 (5th Cir. 1997). Thus, the IJ's dismissal of Petitioners' asylum claims was dispositive of their withholding of removal claims.

4

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (2004).[3] Applicants bear the burden of proving that they qualify for refugee status. 8 C.F.R. § 208.13(a) (2004); *Faddoul*, 37 F.3d at 188. Petitioners assert that they were eligible for asylum because they (1) suffered past persecution on account of their race and religion and (2) possessed a well-founded fear of future persecution on account of their race and religion.

## A. Past Persecution.

Petitioners contend that the IJ erred by holding that they had not suffered past persecution. In particular, they argue that (1) the IJ's factual findings are not supported by substantial evidence and (2) the IJ applied erroneous law by not analyzing the separate incidents of harm in the aggregate.

### 1. Whether substantial evidence supports the IJ's finding of no past persecution.

Petitioners argue that the IJ's finding of no past persecution is not supported by substantial evidence. Persecution has been defined by this Court as:

> The infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive (*e.g.*, race, religion, political opinion, etc.), in a manner condemned by civilized governments. The harm or suffering need not be physical, but may take

---

[3]Being classified as a refugee, however, does not automatically grant the alien asylum. *Mikhael*, 115 F.3d at 303 (recognizing this definition to be "a provision stated in precatory language, *i.e.*, it allows the Attorney General the discretion to grant asylum to refugees").

5

> other forms, such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life.

*Abdel-Masieh v. INS*, 73 F.3d 579, 583-84 (5th Cir. 1996) (citation omitted).[4]

Eduard is a Christian of Manado ancestry; he asserts, however, that Indonesians presume he is Chinese because of his skin tone and the shape of his eyes. When Eduard lived in Indonesia, he was struck in the head with a rock while walking to church. Although Eduard was not able to identify the assailant, he nonetheless presumed that the assailant was a Muslim because the assault occurred just days after a large civil dispute between the Government and the Muslims.[5] Eduard sustained cuts on his head and was given medication to stop the bleeding. Eduard also testified that he was taunted as a "pork eater" by a Muslim while he sat on a bus. Aside from the stone-throwing incident, Eduard was never

---

[4]Persecution is an "extreme concept that does not include every sort of treatment our society regards as offensive." *Nagoulko v. INS*, 333 F.3d 1012, 1016 (9th Cir. 2003) (citation omitted); *see also Ouda v. INS*, 324 F.3d 445, 450 (6th Cir. 2003) ("[D]iscrimination does not ordinarily amount to persecution within the meaning of the Act."); *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998) (stating that persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty").

[5]Petitioners contend that the IJ mischaracterized "the Tanjung Priok riots" as a "civil disturbance caused by certain Muslims failing to obey police orders." Petitioners, however, fail to establish that the IJ's characterization of the riots as a "civil disturbance" was not supported by substantial evidence.

6

physically punished or harmed in Indonesia because of his Christian faith or imputed Chinese ethnicity.

Pakkung is a Christian of Chinese ethnicity. She testified that she was taunted in school by Muslim students and that the bus of a fellow Christian was stoned in 1986. Pakkung, however, did not actually witness the stoning. Pakkung also stated that her grandparents tried to convert her to Islam when she was eight years old. She claimed that they "hit [her] and beat [her] up" when she refused to say Muslim prayers. Pakkung, however, did not testify that she suffered any injuries or that she ever required medical treatment.

The IJ found that "the taunting described by [Eduard] and the general harassment does not rise to the level of a serious punishment or harm that would justify a grant of asylum." The IJ also concluded that "there is no evidence that [Pakkung] was ever targeted for any actual physical abuse in Indonesia."

The IJ's findings are supported by substantial evidence. Neither Eduard nor Pakkung were interrogated, detained, arrested, or convicted in Indonesia. The only violence suffered by either party, on account of either religion or ethnicity, was the injury to Eduard's head allegedly caused by a purported Muslim. The rest of the mistreatment recounted during the IJ hearing was composed of mere denigration, harassment, and threats. Neither discrimination nor harassment ordinarily amounts to persecution under the INA, even if the conduct amounts to "morally reprehensible"

7

discrimination on the basis of race or religion.  *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir. 1996).   Thus, substantial evidence supports the IJ's finding that Petitioners failed to establish past persecution.

> **2.   Whether the IJ applied erroneous law by not analyzing the separate incidents of harm in the aggregate.**

Petitioners also contend that the IJ committed legal error by not considering the incidents of harm in the aggregate.  *Matter of O-Z- & I-Z-*, 22 I & N Dec. 23, 26 (BIA 1998). Neither the Petitioners' briefs nor the IJ's decision establishes that the IJ analyzed each incident of harm in isolation.  Because the burden of proving that the IJ analyzed each incident independently falls on Petitioners, and Petitioners have failed to carry that burden, we do not agree with Petitioners and thus find no error.

**B.   Petitioners' Well-Founded Fear of Persecution.**

Despite an adverse finding on their claims of past persecution, Petitioners can still establish their refugee status by demonstrating well-founded fears of persecution.  An applicant has a well-founded fear of persecution if:

> (A) The applicant has a fear of persecution in his or her country of nationality . . . on account of race, religion, nationality, membership in a particular social group, or political opinion;
>
> (B) There is a reasonable possibility of suffering such persecution if he or she were to return to that country; and
>
> (C) He or she is unable or unwilling to return to, or

8

avail himself or herself of the protection of, that country because of such fear.

8 C.F.R. § 208.13(b)(2)(i). "To show a well-founded fear of persecution, an alien must have a subjective fear of persecution, and that fear must be objectively reasonable." *Lopez-Gomez*, 263 F.3d at 445. The applicant must establish that "a reasonable person in [his] circumstances would fear persecution" in his native country. *Faddoul*, 37 F.3d at 188. Moreover, a finding of a well-founded fear of persecution is negated if the applicant can avoid persecution by relocating to another part of his home country. 8 C.F.R. § 208.13(b)(2)(ii). The well-founded fear standard, however, does not require an applicant to demonstrate that he will be persecuted in his native country; rather the applicant must "establish, to a 'reasonable degree', that return to his country of origin would be intolerable." *Mikhael*, 115 F.3d at 305 (quoting *Cardoza-Fonseca*, 480 U.S. at 439).

Petitioners contend that the IJ erred by holding that they did not establish well-founded fears of persecution. In particular, Petitioners argue that the IJ applied erroneous law to conclude that: (1) their feared persecution was not on account of race or religion; (2) their feared persecution was unreasonable; and (3) they could relocate within Indonesia.

### 1. Whether the IJ applied erroneous law to conclude that Petitioners' feared persecution was not on account of race or religion.

Petitioners contend that the IJ applied erroneous law to

9

conclude that Petitioners' feared persecution was not based on race or religion. The IJ concluded that Petitioners did not satisfy 8 C.F.R. § 208.13(b)(2)(i)(A), which requires that a fear of persecution be "on account of" a protected belief or characteristic. Although the IJ recognized that Petitioners' fears were partially due to their Christianity,[6] the IJ held that such fear was not "on account of" their religion because Indonesia is rife with civil uprisings and violence which are not specific to Christian or Chinese inhabitants.[7]

The IJ supported this legal conclusion by citing *Matter of Mogharrabi*, 19 I & N Dec. 439, 447 (BIA 1987) *abrogated on other grounds by Pitchershaia v. INS*, 118 F.3d 641, 647 (9th Cir. 1997). Respondent cites *Hallman v. INS*, 879 F.2d 1244 (5th Cir. 1989), and

---

[6]The IJ held that "a general climate of violence based, at least in part, on differences between Islam and Christianity and socio-economic tensions, as described by the United States State Department, which are exacerbated by Chinese ethnicity, exists in Indonesia."

[7]The IJ stated that "religious tensions in Indonesia between Christians and Muslims have spawned violence and there is a risk of violence in Indonesia, not only for [Petitioners], but for all citizens who live in Indonesia." The IJ found that "not all of the [forced religious] conversions involve forced conversions of Christians to Islam. There have also been reports of Muslims who are forced to convert to Christianity." The IJ emphasized that "there have been closures and attacks not only on churches, but also temples and mosques, in different parts of Indonesia." The IJ also noted that "both the Christian and the Muslim communities blame each other for initiating and perpetuating violence." The IJ stated that "[a]lthough conditions are tense in parts of Indonesia, it appears that [Petitioners] would not be at any greater risk than any other citizen of Indonesia if they returned."

10

*Campos-Guardado v. INS*, 809 F.2d 285 (5th Cir. 1987), to further support the IJ's conclusion. None of these cases, however, holds that a fear of persecution based on a protected belief or characteristic is negated simply because the applicant also fears general civil violence and disorder.

*Mogharrabi* states:

> [A]n alien who succeeds in establishing a well-founded fear of persecution will not necessarily be granted asylum. He must also show that the feared persecution would be on account of his race, religion, nationality, membership in a particular social group, or political opinion. *Thus, for example, aliens fearing retribution over purely personal matters, or aliens fleeing general conditions of violence and upheaval in their countries, would not qualify for asylum.* Such persons may have well-founded fears, but such fears would not be on account of their race, religion, nationality, membership in a particular social group, or political opinion.

*Mogharrabi*, 19 I & N Dec. at 447 (emphasis added).

In *Campos-Guardado*, we found that an applicant's fear of persecution on account of her uncle's political opinion did not support a finding of a well-founded fear of persecution. 809 F.2d at 288, 291. We stated that Congress, when it passed the statute governing asylum applications, "did not intend to confer eligibility for asylum on all persons who suffer harm from civil disturbances–conditions that necessarily have political implications." *Id.* at 290.

In *Hallman*, we held that a bombing raid upon an applicant's village was not on account of the applicant's political opinion, but rather a battlefield tactic designed to eliminate a source of

11

security and support available to guerillas in a war zone. 879 F.2d at 1247. We concluded that "asylum is not available to every victim of civil strife, but is restricted to those persecuted for particular reasons." *Id.*

These cases hold that an applicant's fear of persecution cannot be *based solely* on general violence and civil disorder. None of these cases, however, supports the IJ's proposition that fear based on a protected belief or characteristic is *negated* simply because of general violence and civil disorder. Congress no doubt anticipated that citizens of countries rife with general violence and civil disorder would seek asylum in the United States. If it had intended to deny refugee status to applicants from such countries, who also feared persecution based on one of the five statutorily protected beliefs and characteristics, it would have presumably stated so.

Upon review of the record, it is clear that Petitioners' fears of persecution were not based solely on the peripheries of civil violence and disorder.[8] For example, Pakkung submitted in her application that she:

> [I]s afraid to go back to Indonesia because Christians are being persecuted there by the Moslems and the Indonesian government cannot control them. Killings, bloodshed, burnings, persecutions of Christians are happening all over Indonesia in places like Jakarta,

---

[8]It is less clear whether Petitioners established that they feared persecution on account of their Chinese ethnicity (or imputed ethnicity in Eduard's case).

> Bandung, Solo, Situbondo, Surabaya, Lombok, Bali, West Kalimantan, Ujung Pandang, Poso, Maluku Island and even in Irian Jaya . . . . When the Government catches the Moslem culprits, they pardon and release them.

She also testified that she feared being persecuted by the Laskar Jihad, a group which pressures Christians to convert to Islam.

Eduard testified that the Muslim majority presents a risk to Christians everywhere in Indonesia under present conditions. Eduard's siblings, who live in Indonesia, are afraid to attend church due to the violence. Another witness, Gideon Tandirerung, confirmed that Christians are pressured to convert to Islam and that churches are routinely burned. He also described the widespread influence of the Laskar Jihad, who are responsible for forced conversions and other physical violence against Christians.

A review of the record indicates that Petitioners' fears of persecution were based on their Christian faith in particular, and Indonesian civil strife in general. The IJ committed legal error by analyzing whether Petitioners' fear of persecution was "on account of" their race or religion using a standard not supported by case law or the regulations.

**2. Whether the IJ applied erroneous law to conclude that the Petitioners' fear of persecution was unreasonable.**

Petitioners also contend that the IJ applied erroneous law to conclude that their fears of persecution were unreasonable. *See generally Mikhael*, 115 F.3d at 304 (holding that a well-founded fear of persecution must be reasonable). To demonstrate the

13

reasonableness of a well-founded fear of persecution, an asylum applicant must show that: (1) he possesses a belief or characteristic a persecutor seeks to overcome by means of punishment of some sort; (2) the persecutor is already aware, or could become aware, that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and, (4) the persecutor has the inclination to punish the alien. *Mogharrabi*, 19 I & N Dec. at 446.

The IJ misstated the legal standard to establish a "reasonable" fear of persecution. The IJ stated:

> A reasonable fear of persecution is not only a subjective fear. In addition an applicant must establish that: (1) the applicant possesses a belief or characteristic connected to one of the five statutory grounds for asylum; (2) *the applicant has been targeted for punishment or harm based on that belief or characteristic*; (3) the persecutor *is aware, or becomes aware,* that the applicant possesses that belief or characteristic; (4) the persecutor has the capability to punish or harm the applicant; (5) the persecutor has the inclination to punish or harm the applicant; and (6) the threat of persecution is country wide.

(Citing *Matter of Acosta,* 19 I & N Dec. 211, 231 (BIA 1985) (emphasis added)). It is unclear why the IJ cites *Acosta* as authority for the above statement of law, where that case fails to discuss either the second or sixth element mentioned by the IJ and outlines the third element differently than the IJ's opinion. *See id*. at 231. Respondent concedes that the IJ "slightly misstated" the analysis. Petitioners argue that the IJ erred by (1) requiring them to prove that they had been targeted, (2) requiring them to

14

prove that the persecutor is aware of their beliefs, and (3) improperly considering the safety of Petitioners' family members in Indonesia.[9]

### a. Whether the IJ erred by requiring Petitioners to prove that they had been targeted.

Petitioners contend that the IJ erred by requiring them to prove that they "ha[d] been targeted for punishment or harm based on [a protected] belief or characteristic." The IJ held that Petitioners failed to meet this element: "Although a general climate of violence based, at least in part, on differences between Islam and Christianity and socio-economic tensions, as described by the United States State Department, which are exacerbated by Chinese ethnicity, exists in Indonesia, [Petitioners] have not been targeted for any of these reasons in the past in Indonesia."

The asylum regulations provide that:

In evaluating whether the applicant has sustained the burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge *shall not require the applicant to provide evidence that there is a reasonable possibility he or she would be singled out individually for persecution* if:

> (A) The applicant establishes that there is a pattern or practice in his or her country of .

---

[9]Element six, although not analyzed in this part of the opinion, is also not a factor to determine the "reasonableness" of the applicant's fear. Rather, an IJ should conduct a "relocation" analysis upon finding that the fear of future persecution is reasonable. 8 C.F.R. § 208.13(b)(ii) (2004) ("An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality . . . .").

15

> . . persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and
>
> (B) The applicant establishes his or her own inclusion in, and identification with, such group of persons such that his or her fear of persecution upon return is reasonable.

8 C.F.R. 208.13(b)(2)(iii) (emphasis added).

It is clear from the record, and the IJ's findings, that there was a pattern of persecution of Christians in Indonesia.[10]  Thus, Petitioners were not required to show that they would be singled out for persecution upon return to Indonesia.  *Id.*  Moreover, requiring an applicant to prove past targeting to establish a well-founded fear would effectively replicate the past persecution inquiry.  Thus, the IJ committed legal error by requiring that Petitioners prove they had been targeted in the past.

**b.**    **Whether the IJ erred by requiring Petitioners**

---

[10]The IJ noted that the United States State Department has reported that in Indonesia there were "122 religiously motivated attacks on Christian churches and other Christian facilities during 2000. . . .   These attacks resulted in 3,000 deaths, the displacement of nearly 500,000 people, and damage to at least 81 churches and dozens of mosques."  Pakkung claimed that "[k]illings, bloodshed, burnings, persecutions of Christians are happening all over Indonesia in places like Jakarta, Bandung, Solo, Situbondo, Surabaya, Lombok, Bali, West Kalimantan, Ujung Pandang, Poso, Maluku Island and even in Irian Jaya."  Gideon Tandirerung confirmed that Christians are pressured to convert to Islam and churches are routinely burned. Gideon Tandirerung testified that the Laskar Jihad is widely influential throughout Indonesia.  He specified that the Laskar Jihad, in its efforts to convert Christians to Islam, routinely burns churches and commits physical acts of violence against Christians.

16

**to prove that persecutors had actual awareness of Petitioners' religion and ethnicity.**

Petitioners also contend that the IJ erred by requiring them to prove that "the persecutor is aware, or becomes aware, that the applicant possesses that belief or characteristic."  It is well-settled that asylum applicants must only demonstrate that a feared persecutor "could easily become aware" of an applicant's protected beliefs or characteristics. *Mogharrabi*, 19 I & N Dec. at 446.  Due to the ambiguity of the IJ's decision, it is unclear whether the IJ actually required Petitioners to prove that persecutors were already aware of their race or religion.  Requiring such proof is legal error and is significant because Petitioners' ethnicity and Christian faith are easily discoverable by potential persecutors in Indonesia.  Thus, the IJ erred by requiring Petitioners to prove that the persecutors were aware of Petitioners' race or religion.

**c.  Whether the IJ erred by improperly considering the safety of Petitioners' family members in Indonesia.**

The IJ emphasized that the reasonableness of Petitioners' fears was diminished because their family members in Indonesia had not been persecuted.[11]  Petitioners contend that the IJ "applied an incorrect legal standard to determine the significance of family

---

[11]Eduard's siblings have not been harmed as a result of either their imputed Chinese ethnicity or Christian faith.  Although Pakkung's mother is afraid to go to church because of the recent church burnings, she has not been harmed because of her Chinese ethnicity or Christianity.  Pakkung's brother, however, was beaten at an Indonesian school when he was eight years old.

17

members residing in Indonesia to the question of whether [they] have a well-founded fear of persecution there."

In *Matter of A-E-M-*, 21 I & N Dec. 1157, 1160 (BIA 1998), the BIA held that the reasonableness of an alien's fear of persecution is reduced when his family remains in his native country unharmed for a long period of time after his departure. Petitioners attempt to distinguish *A-E-M-,* where persecutors existed in only limited areas, from cases, such as theirs, where the feared persecutors operate throughout the whole country. Such a distinction is not valid.

The holding of *A-E-M-* is not limited to cases where the persecutor operates regionally. *Id.* at 1159-61. The opinion merely sets out several factors to be considered, and applies those factors to the facts of the case, which happened to involve persecutors with a mere regional influence. *Id.* There is no logical reason to distinguish between those cases with a regional persecutor and those cases involving a national persecutor; in fact, ongoing family safety seems to be an even stronger indicator of "unreasonable" fear when the feared persecutor has a national influence. Thus, it was not legal error for the IJ to consider the fact that Petitioners' families remain in Indonesia unharmed.[12]

---

[12]Respondent does not cite any authority establishing that the safety of family members is enough, by itself, to render a fear of persecution unreasonable. Thus, it appears that it is merely one factor which courts should consider.

In summary, although the IJ was not precluded from considering the safety of Petitioners' family members in Indonesia, the IJ's holding that Petitioners' fear of persecution was unreasonable was nonetheless based on erroneous law. In particular, the IJ erred by requiring Petitioners to prove that they had been targeted for punishment in the past. The IJ also erred in its analysis regarding whether persecutors were required to be aware of Petitioners' protected beliefs and characteristics.

### 3. Whether the IJ applied erroneous law to conclude that Petitioners could relocate within Indonesia.

Although the IJ applied improper legal analyses to determine whether Petitioners' fears of persecution were "reasonable," such errors are harmless if Petitioners could safely relocate within Indonesia.

> An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality . . . if under all the circumstances it would be reasonable to expect the applicant to do so.

8 C.F.R. § 208.13(b)(2)(ii). The regulations direct the IJ to consider:

> [W]hether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and family ties. Those factors may, or may not, be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

19

*Id.* § 208.13(b)(3).

Because there was no showing of past persecution, Petitioners had the burden to establish that their relocation was unreasonable. *Id.* § 208.13(b)(3)(i) ("In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecution is by a government or is government-sponsored.").

Petitioners were required to show that relocation in Indonesia was "not reasonable." The IJ held that "although there are differences in Indonesia with regard to the diverse populations, that [Petitioners] could, *if necessary*, relocate within Indonesia to avoid problems." (Emphasis added). The IJ's finding that Petitioners could relocate "if necessary" in no way indicates that the IJ applied the requisite standard of proof that relocation be "not reasonable."

Moreover, the tone of the IJ's decision reveals the IJ did not analyze whether Petitioners' relocation would be "not reasonable." For instance, the IJ recognized many of the hardships of relocating within Indonesia. The IJ recounted Eduard's testimony that "Indonesia has many diverse groups, and it would be difficult to relocate within Indonesia in an inconspicuous way, and always the Muslim majority would present a risk under present conditions." The IJ also recognized that the Laskar Jihad has infiltrated the

20

Christian settlements within Indonesia.[13]    The IJ applied an erroneous heightened standard of proof by requiring that Petitioners establish they would be unable to relocate even "if necessary."

In conclusion, the IJ correctly held that Petitioners did not suffer past persecution.  The IJ committed legal error, however, in holding that Petitioners did not have a well-founded fear of persecution.  In particular, the IJ applied erroneous law in concluding that: (1) Petitioners' fear was not based on race or religion, (2) Petitioners' fear was unreasonable, and (3) Petitioners could relocate within Indonesia.

Petitioners' applications for withholding removal under INA § 241(b)(3)(B) were summarily denied based on the IJ's denial of their applications for asylum.  Thus, the IJ's denials of Petitioners' applications for asylum and withholding of removal under INA § 241(b)(3)(B) are reversed and remanded for a determination under the proper legal standards.

## II.   Whether the IJ erred by failing to address Petitioners' claims for relief under the CAT.

The IJ did not address whether Petitioners' removal may be withheld under the CAT.   Respondent explains that Petitioners

---

[13]Petitioners presented substantial evidence emphasizing the severe barriers to relocation in the Indonesian archipelago: the one million Indonesians currently displaced; the various ethnic upheavals throughout the country; and the diversity of languages and customs.

failed to raise sufficient claims for relief under the CAT.[14] Petitioners, however, contend that their applications for asylum and withholding of removal under INA § 241(b)(3)(B) constituted sufficient claims for CAT relief.[15]

Petitioners argue that, as a matter of law, CAT claims are raised every time an applicant files for asylum or withholding of removal under INA § 241(b)(3)(B). We do not agree. A claim under the CAT is a separate claim from withholding of removal under the INA. *Efe v. Ashcroft*, 293 F.3d 899, 906-07 (5th Cir. 2002). Moreover, regulatory language indicates that applicants must demonstrate some specific intent to raise a claim for CAT relief. Title 8, C.F.R. § 208.18(b) states that "[a]n alien who is in exclusion, deportation, or removal proceedings on or after March 22, 1999 may *apply* for withholding of removal under [the CAT]."

---

[14]It is irrelevant that Petitioners raised claims for CAT relief before the BIA. *See generally Matter of Jimenez-Santillano*, 21 I. & N. Dec. 567, 570 n.2 (BIA 1996) (stating that BIA need not consider an issue raised for the first time on appeal); *Matter of Edwards*, 20 I & N Dec. 191, 196 n.4 (BIA 1990) (same).

[15]Petitioners first contend that the BIA should not have summarily affirmed the decision of the IJ as a matter of law because it contained "substantial factual and legal issues." We do not agree with Petitioners as such review would be "unnecessary and duplicative" because courts review the actual merits of the claim when addressing the IJ's decision. *Carriche v. INS*, 335 F.3d 1009, 1018 (9th Cir. 2002), *amended and superseded by* 350 F.3d 845 (9th Cir. 2003). That is, "[t]he decision to streamline becomes indistinguishable from the merits" of the case. *Id.* If the IJ's decision is incorrect, the Board "is saddled with any errors the IJ makes and with the risk of reversal on grounds that do not reflect the BIA's actual reasons." *Id.*

(Emphasis added). In addition Title 8, C.F.R. § 208.16(c)(4) states: "In considering *an application for withholding of removal under the Convention Against Torture*, the immigration judge shall first determine whether the alien is more likely than not to be tortured in the country of removal." (Emphasis added). Thus, a claim for CAT relief is not raised, as a matter of law, by simply filing an application for asylum or withholding of removal under INA § 241(b)(3)(B).

Petitioners next contend that their responses to their "Application for Asylum and/or Withholding of Removal" constituted, as a matter of fact, a claim for CAT relief. Their asylum applications expressly stated that they feared being subjected to torture in Indonesia. Question 5 of the application asked: "Do you fear being subjected to torture (severe physical or mental pain or suffering, including rape or other sexual abuse) in your home country or any other country if you return?" Both Petitioners marked the box stating "Yes," and described their fears of future torture related to their religion and ethnicity. For example, Pakkung stated on her application that "[k]illings, bloodshed, burnings, persecutions of Christians are happening all over Indonesia" and "[a] lot of bodies have been thrown in the forest and become food for wild pigs." Eduard stated on his application that he is "afraid [he] will be beaten or killed for practicing [his] religion."

23

Neither the regulations nor the briefs nor arguments in this case elaborate on what constitutes a sufficient claim for CAT relief. Nonetheless, applicants who file for general withholding of removal under INA § 241(b)(3)(B), and express on such application their fear of torture, probably *believe* that they have raised a claim for CAT relief. For instance, CAT relief is described in the same Federal Regulation that outlines the withholding of removal under INA § 241(b)(3)(B). *See* 8 C.F.R. § 208.16(c). Likewise there is no separate form that an applicant must file to claim relief under the CAT. Moreover, withholding of removal under INA § 241(b)(3)(B) does not require that an applicant have a fear of torture; therefore, the very existence of a question regarding torture on the application for general withholding of removal might lead an applicant to believe he has raised a claim for CAT relief. Because there is no separate and distinct procedure for seeking CAT relief, then Petitioners' application responses, which clearly evinced their fears of torture, constitute claims for relief under the CAT.

Respondent, however, argues that Petitioners did not expressly mention the CAT during their hearing before the IJ. Nonetheless, Respondent cites no authority to establish that an applicant need restate legal claims which had been previously claimed in a written application.

Petitioners raised claims for withholding of removal under the

24

CAT but the claims were ignored. Therefore, we find that the CAT claims were raised before the IJ, and Respondent concedes that a remand of this issue is required if the CAT claims were raised. *See INS v. Ventura*, 537 U.S. 12, 16-18 (2002) (holding that the courts of appeals may not review the administrative records to consider matters that must have been determined by the agency in the first instance).

## CONCLUSION

Having carefully reviewed the record of this case, the parties' respective briefing and arguments, for the reasons set forth above we hold the following. The IJ did not err by finding that Petitioners failed to establish past persecution. The IJ nonetheless erred by holding that Petitioners did not have a well-founded fear of persecution. In particular, the IJ applied erroneous law in concluding that: (1) Petitioners' fear was not based on race or religion, (2) Petitioners' fear was unreasonable, and (3) Petitioners could relocate within Indonesia. Petitioners also raised CAT claims before the IJ that were not addressed. Thus, the IJ's denial of Petitioners' applications for asylum, withholding of removal under INA § 241(b)(3)(B), and withholding of removal under the CAT is reversed and remanded for further proceedings not inconsistent with this opinion.

**REVERSED AND REMANDED.**

EMILIO M. GARZA, Circuit Judge, dissenting.

25

The majority opinion is not properly deferential to the immigration judge's ("IJ") finding that Eduard and Pakkung could reasonably relocate to parts of Indonesia where they would not be subject to future persecution. It cites no evidence in the record that "compels a contrary conclusion," *see* 8 U.S.C. § 1252(b)(4)(B); *I.N.S. v. Elias-Zacharias*, 502 U.S. 478, 481 & n.1 (1992), and ignores the "substantial evidence" cited by the IJ demonstrating that such a relocation would be reasonable, *see Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 444 (5th Cir. 2001). Further, the majority opinion incorrectly concludes that Eduard and Pakkung raised their Convention Against Torture ("CAT") claims in their asylum applications. Eduard and Pakkung neither requested relief under the CAT, nor did they articulate a factual basis to support such a claim in either their asylum applications or in their hearing before the IJ. Thus neither the IJ nor the Board of Immigration Appeals ("BIA") erred by not considering the claims. Because I believe there is no evidence in the record compelling reversal of the IJ's refusal to grant the petitioners asylum petitions, I respectfully dissent.

"An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality . . . if under the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(2)(ii). "[T]he applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate . . . ." 8 C.F.R.§ 208.13(b)(3). Based on a country report from the State Department which concluded that most of the attacks against Christians in Indonesia "occurred in north Maluku and central Sulawesi provinces," the IJ determined that "the more serious incidents of violence and forced conversions . . . have been localized." It then concluded, taking into account "differences in Indonesia with regard to the diverse populations, that the respondents could, if necessary, relocate within Indonesia" to avoid the areas where the religious persecutions are most acute.

26

The majority opinion concludes that the IJ applied a "heightened standard of proof by requiring Petitioners establish they would be unable to relocate even 'if necessary.'" The IJ did not apply a fictional "if necessary" standard to the petitioners' claims. Rather, it simply noted that upon returning to Indonesia the petitioners could reasonably relocate to parts of the country where violence against Christians is significantly less prevalent, if necessary. If Eduard and Pakkung, however, found that their fear of persecution in their home region was unwarranted, then such a relocation would be unnecessary. Admittedly, the IJ never used the magical word "reasonable" in concluding that the petitioners could relocate to safer parts of Indonesia upon their return home. However, such a conclusion is implicit in the IJ's finding that the petitioners could relocate "if necessary," and its ultimate denial of both petitions for asylum for failure to establish a well-founded fear of persecution.

Further, the majority opinion points to no evidence in the record compelling a contrary conclusion. *See* 8 U.S.C. § 1252(b)(4)(B) ("The administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."); *Elias-Zacharias*, 502 U.S. at 481 & n.1; *Ontunez-Turcios v. Ashcroft*, 303 F.3d 341, 351 (5th Cir. 2002) (Petitioner "must set forth evidence so compelling that no reasonable factfinder could fail to find" a well-founded fear of persecution.). The majority opinion cites to testimony from Eduard that he believes that it would be difficult to relocate within Indonesia and to the IJ's finding that Laskar Jihad has infiltrated Christian settlements within Indonesia to support its reversal of the IJ's ruling.

The majority opinion's reliance on this evidence is unwarranted. The IJ specifically found that the Laskar Jihad's activities were limited to particular regions of Indonesia))giving the petitioners the opportunity to relocate to other parts of the country. Further, Eduard's conclusory

27

testimony that he believes that it would be too difficult to relocate in Indonesia does not by itself make the IJ's conclusion to the contrary unreasonable. The IJ relied on a State Department report to conclude that the threat of persecution was limited to certain regions of the country, and considered the ethnic and cultural differences between regions of Indonesia in concluding that relocation was reasonable. Eduard's testimony, though informative, does not negate the veracity of the State Department report, the reasonableness of the IJ's reliance on it, or the IJ's ultimate conclusion that the petitioners could reasonably relocate.

The majority opinion points to no evidence in the record that suggests that the IJ's conclusion that religious persecution of Christians is limited to certain regions of Indonesia is unreasonable, or even incorrect. Further it points to no evidence that establishes that moving to a different part of Indonesia would demonstrate a unique hardship to the petitioners, or that they would be targeted for religious persecution in parts of Indonesia not identified by the State Department's report or the IJ's opinion. The majority's decision to reverse the IJ's ruling seems to be due to its uncomfortableness with "the tone of the IJ's decision." Improper tone is not a legitimate reason to reverse an IJ's ruling. This is especially the case here because the IJ's decision is supported by substantial evidence and there is no evidence in the record compelling a contrary ruling.

The majority opinion finds that the IJ and the BIA erred in not considering Eduard and Pakkung's CAT claims, first raised in their appeal to the BIA, because the petitioners might have believed that they raised their CAT claims as part of their application for withholding of removal. The majority opinion concedes that neither Eduard nor Pakkung explicitly requested relief under CAT in their asylum applications or during their hearing before the IJ. But it concludes that because the petitioners checked the YES box under the question "Do you fear being subjected to torture. . . if you

28

return?" on their asylum applications the IJ should have assumed they were seeking relief under CAT and considered their unarticulated claims. I cannot agree.

As the majority notes, an applicant must demonstrate specific intent to raises a claim for CAT relief. *See* C.F.R. § 208.18(b) (requiring alien to "apply for withholding of removal under [the CAT]"). There is no doubt that neither Eduard nor Pakkung specifically requested relief under CAT. While I am comfortable with the majority opinion's conclusion that an alien may articulate a claim under CAT without specifically referring to the convention, under certain circumstances, I do not believe that the petitioners articulated such a claim. Indeed, both Eduard and Pakkung checked the YES box under the question "Do you fear being subjected to torture . . . if you return?"; however, neither articulated a factual claim of fear of torture.

The regulations implementing the CAT define torture:

> as any act by which *severe pain or suffering*, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of *a public official or other person acting in an official capacity*.

8 C.F.R. 208.18(a)(1) (emphasis added).

In his asylum application Eduard simply states that he fears that he will be beaten or killed because of his religion. He never claims that he would be tortured by "a public official or other person acting in an official capacity," as is required by the regulations. In fact, his fear of being killed or beaten is based, he claims, on "the long history of violence between Muslims and Christians in Indonesia," not on any belief on his part that the Indonesian government would target him for torture.

29

Pakkung's asylum application is similarly devoid of a claim of fear of torture. While in her affidavit she does articulate a grim scene in Indonesia where "killings, bloodshed, [and] burnings" are occurring in parts of the country, she does not claim that either she or anyone she knows has either been tortured or is targeted for torture. Pakkung neither uses the term torture in her affidavit, nor does she describe any factual situation where a public official has inflicted or intends to inflict severe physical or mental pain on her or anyone similarly situated to her.

While I can understand that an alien may be confused as to the process for applying for relief under CAT, I do not believe that a person intending to seek relief under the convention would be at all confused about the need to articulate a factual claim of fear of torture. Neither Eduard nor Pakkung claimed in their asylum applications and affidavits or during their hearing before the IJ that they believed that they would be tortured if they returned to Indonesia, much less that they would be tortured by a public official.

An IJ cannot consider and rule on a claim for relief under CAT if he does not know that a claim has been made. The IJ cannot possibly know that such a claim has been made if the alien does not specifically request relief under the convention or at least articulate a factual claim of fear of torture that would be cognizable under the regulations implementing CAT. *Cf. Portis v. Nat. Bank of New Albany, Mississippi*, 34 F.3d 325, 331 (5th Cir. 1993) ("The raising party must present the issue so that it places the opposing party and the court on notice that a new issue is being raised."). Because Eduard and Pakkung never articulated to the IJ that they either feared being tortured if they returned to Indonesia or that they desired to seek relief under CAT, I do not believe they raised their CAT claims to the IJ. Neither the IJ nor the BIA erred by not ruling on these claims.

I believe there is substantial evidence supporting the IJ's refusal to grant Eduard and Pakkung

applications for asylum, and the IJ and BIA did not err by not considering the petitioners claims under the CAT.  I would affirm its decision, and thus respectfully dissent.