United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 9, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

—————————————

No. 04-60938
Summary Calendar

—————————————

BELUL QOKU,

                                        Petitioner,

versus

ALBERTO R. GONZALES, U.S. ATTORNEY GENERAL,

                                        Respondent.

—————————————

On Petition for Review from an Order of
the Board of Immigration Appeals
No. A27 231 251

—————————————

Before HIGGINBOTHAM, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:[*]

    Belul Qoku petitions for review from the Board of Immigration
Appeals's denial of his motion to reopen a deportation order.  For
the reasons below, we deny the petition.

## I.  Background

    Qoku is an ethnic Albanian and a citizen of Macedonia, which
was formerly part of Yugoslavia.  On February 21, 1987, Qoku
entered the United States illegally.  Qoku was immediately taken

_____

    [*] Pursuant to 5th Cir. R. 47.5, the Court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5th Cir. R.
47.5.4.

into custody by the Immigration and Naturalization Service ("INS"). On February 22, 1987, he was served with an Order to Show Cause and Notice of Hearing ("OSC"). The OSC ordered him to appear at a hearing on March 3, 1987, to show cause why he should not be deported.

On February 26, 1987, Qoku entered into a written stipulation with the INS ("the stipulation"). The stipulation states that Qoku "admits all the allegations of fact and concedes the charge of deportability." Under the stipulation, the INS agreed to grant Qoku additional time, until April 26, 1987, to submit a written request for relief from deportation. Qoku agreed that if he failed to submit such a written request, he would "accept a final order of deportation" and "waive appeal from any order entered pursuant to this stipulation." The stipulation provided, in all capital letters, "Respondent's undersigned certifies that this stipulation has been fully explained to and is entered into with the full knowledge and consent of respondent." It was signed by Qoku's attorney, Bertha Galindez; an INS representative; and the immigration judge ("IJ").

On the day of the stipulation, Galindez filed a motion to reduce Qoku's bond, noting the stipulation as a reason that bond be lowered. The INS agreed to the reduction. Qoku paid his reduced bond and was ordered released from custody "by agreement."

Qoku failed to make an application for relief from deportation by April 26. He was ordered deported to Yugoslavia on April 28,

2

1987.  The IJ determined that Qoku was deportable "[u]pon the basis of respondent's admissions" and made the order "pursuant to stipulation of 2-26-87."  The immigration court's order further states, "Copy of this decision has been served upon respondent."  No further legal action was taken by any party until 1996.

On February 12, 1996, Qoku filed a motion to reopen the immigration proceedings.  He requested suspension of the deportation order on the grounds that deportation would present an extreme hardship.  An IJ denied the motion, and Qoku did not appeal.

Qoku filed a second motion to reopen on January 6, 2004.[1]  He attacked the original deportation on several grounds.  He also sought suspension of deportation, asylum, and withholding of removal.  The IJ denied the motion, and the Board of Immigration Appeals ("BIA") affirmed, issuing a brief opinion.  The IJ and the BIA determined that most of Qoku's claims were time-barred.  Regarding Qoku's asylum and withholding of removal claims, the BIA ruled that he had not made a prima facie case of persecution or torture.  Qoku petitions for review of the IJ's and BIA's orders.

## II.  Standard of Review

---

[1] Current regulations limit aliens to one motion to reopen. *See* 8 C.F.R. § 1003.23(b)(1) (2005).  The Board of Immigration Appeals determined below that Qoku's motion was filed before the effective date of that restriction and was therefore not "number-barred."

The BIA expressly adopted the IJ's ruling and added its own reasons for denying the motion to reopen. In such a situation, we review both the IJ's and the BIA's decisions together. *See Krasnopivtsev v. Ashcroft*, 382 F.3d 832, 837 (8th Cir. 2004); *Guo v. Gonzales*, 2005 WL 2868311, *1 (5th Cir. Nov. 1, 2005) (unpublished) (citing *Polat v. Gonzales*, 2005 WL 1274502, *1 (5th Cir. May 27, 2005) (unpublished)).

Our review of these decisions is quite limited. Motions to reopen are "plainly disfavor[ed]" because there is a "strong public interest" in the finality of immigration decisions. *INS v. Abudu*, 485 U.S. 94, 95–110 (1988). The BIA has wide latitude in deciding whether to grant or deny a motion to reopen. *Id.* Accordingly, we review the denial of a motion to reopen "under a highly deferential abuse-of-discretion standard." *Zhao v. Gonzales*, 404 F.3d 295, 304 (5th Cir. 2005).

> It is our duty to allow [the] decision to be made by the Attorney General's delegate, even a decision that we deem in error, so long as it is not capricious, racially invidious, utterly without foundation in the evidence, or otherwise so irrational that it is arbitrary rather than the result of any perceptible rational approach.

*Id.; see Bahramnia v. INS,* 782 F.2d 1243, 1244–45 (5th Cir. 1986).

### III. Discussion

**A.  Challenges to the 1987 Deportation Order and Suspension of Deportation**

In the proceedings below, Qoku challenged the 1987 deportation order on several grounds. He claimed (1) ineffective assistance of

4

counsel,[2] (2) that he did not agree to the stipulation signed by Galindez, (3) that he lacked notice of the deportation order, and (4) that he was denied due process. He also sought reopening for suspension of deportation for extreme hardship. Qoku contends on appeal that the IJ and BIA erred in rejecting these claims as time-barred.

Ordinarily, motions to reopen "must be filed within 90 days of the date of entry of a final order of . . . deportation . . . or before September 30, 1996, whichever is later." 8 C.F.R. § 1003.23(b)(1). The regulations provide certain exceptions to the deadlines for filing motions to reopen where the original order was "entered in absentia in deportation proceedings." 8 C.F.R. § 1003.23(b)(4)(iii)(A). Qoku argues that he was ordered deported *in absentia* and should have been considered eligible for these exceptions. We disagree.

Under the statutory framework applicable for Qoku's 1987 case, deportability was generally determined "upon a record made in a proceeding before a special inquiry officer." 8 U.S.C. § 1252(b) (1982). The alien had a right to attend the deportation hearing. *Id.* If the alien "fail[ed] or refuse[d] to attend" the hearing,

---

[2] Before the IJ and BIA, Qoku argued that Galindez, his original attorney, was ineffective. Qoku claims for the first time on appeal that the attorney who represented him on his first motion to reopen in 1996 was also ineffective. Because this claim was not raised before the IJ or BIA, we have no jurisdiction to consider it. *See Wang v. Ashcroft*, 260 F.3d 448, 452–53 (5th Cir. 2001).

the IJ could proceed in his absence. *Id.* In Qoku's case, there was no proceeding conducted in his absence after he failed or refused to attend. There was no hearing at all because Qoku was ordered deported by agreement, "pursuant to stipulation of 2-26-87." The 1987 deportation order, entered by agreement and without a hearing, does not qualify as a proceeding *in absentia*. *See In re Feldman*, 2004 WL 1167332, *1 (BIA Feb. 17, 2004) (unpublished) (per curiam) (holding that an "order . . . entered because the respondent failed to file his application for relief within the time set by the Immigration Judge" was not an *in absentia* proceeding).

Since the 1987 proceedings were not *in absentia*, the ordinary deadlines for motions to reopen apply to Qoku's challenges to the 1987 deportation order and to his claim for suspension of deportation. *See* 8 C.F.R. § 1003.23(b)(4)(i)–(iv) (providing an exclusive list of "[e]xceptions to filing deadlines").[3] Qoku's second motion to reopen was filed more than seven years after the September 30, 1996 deadline.[4] The IJ and BIA did not abuse their discretion in declining to reopen proceedings on the ground that

---

[3] Qoku's brief appears to assume that these ordinary time constraints do not apply to ineffective assistance of counsel claims. This is incorrect. *See, e.g.*, *Galvez Pineda v. Gonzales*, 427 F.3d 833, 835 (10th Cir. 2005).

[4] Qoku expressly disavows any claim to equitable tolling of the deadline for motions to reopen. Thus, we need not address the ruling below that Qoku failed to exercise due diligence.

these claims were untimely.[5]

## B. Due Process Challenge to 2004 Proceedings

Qoku incorrectly argues that the BIA ignored both his claim under the Convention Against Torture ("CAT") and evidence he submitted of changed conditions in Macedonia, thereby violating his right to due process. The BIA opinion stated:

> The respondent . . . argued on appeal that proceedings should be reopened because there have been changed conditions in Macedonia, and he fears persecution *or torture* if he returns. *Notwithstanding the changes in the respondent's country*, the Board cannot conclude that the respondent is prima facie eligible for asylum or withholding of removal based upon changes in Macedonia. Nothing presented with the respondent's motion or appeal establishes that the respondent would likely prevail if the record was reopened and remanded for a hearing.

*In re Qoku*, A27-231-251 (BIA Sep. 23, 2004) (emphasis added). The BIA need not "write an exegesis on every contention." *Efe v. Ashcroft*, 293 F.3d 899, 907 (5th Cir. 2002). We require "merely that it consider the issues raised . . . in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Id.* In *Roy v. Ashcroft*, 389 F.3d 132, 139–40 (5th Cir. 2004), we held that the BIA was not required to separately analyze a claim where this Court could infer the BIA's implicit reasons for denying it. The BIA's consideration in the

---

[5] Qoku complains that the BIA failed to consider evidence he submitted in support of his claim for suspension of deportation. The BIA determined, however, that Qoku's motion was untimely. It need not have addressed the merits of a time-barred claim. *See* 8 C.F.R. § 1003.23(b)(1).

instant case, while brief, was sufficient. *See Selimi v. Ashcroft*, 360 F.3d 736, 739–40 (7th Cir. 2004). The opinion did address Qoku's CAT claim,[6] acknowledge the evidence he submitted, and explain the ground for denying his claims. Qoku's due process argument fails.

## C.    Asylum

The time limitations on motions to reopen do not apply to asylum claims based on changed country conditions. 8 C.F.R. § 1003.23. Qoku argues that the BIA erred in determining that he did not make a prima facie showing of eligibility for asylum. We find no abuse of discretion. *See Bahramnia*, 782 F.2d at 1244-45. The Supreme Court has recognized that the BIA may deny a motion to reopen if it determines that the applicant "has not established a prima facie case for the underlying relief sought." *Abudu*, 485 U.S. at 104–05. To make a prima facie showing of eligibility for asylum, movants must demonstrate a reasonable likelihood that they have met the requirements for the relief sought. *Flores v. INS*, 786 F.2d 1242, 1247 (5th Cir. 1986). Eligibility for asylum "requires a showing of past persecution or a well-founded fear of persecution" on account of race, religion, nationality, membership

---

[6] The BIA's holding that Qoku was not prima facie eligible for withholding of removal is responsive to his CAT claim. The only claim under CAT exempt from the ordinary time restraints on motions to reopen is withholding of removal. *See* 8 C.F.R. § 1003.23(b)(4).

in a particular social group, or political opinion. *Roy*, 389 F.3d 132, 138 (5th Cir. 2004). Qoku is an ethnic Albanian, a Muslim, and involved with an Albanian political organization. He claims asylum on these bases.

**1. Past Persecution**

Qoku argues that he presented a prima facie case of past persecution. Qoku introduced evidence of several incidents of mistreatment by the Yugoslavian Communist regime.[7] First, Qoku's father was mistreated based on his political opinions. Specifically, the authorities arrested him and terminated him from his job. Additionally, Qoku's father was arrested a second time in 1989 and "questioned by authorities as to where his son had gone." Incidents of persecution against a family member may demonstrate past persecution only if they show "a pattern of persecution closely tied to the asylum applicant." *Chinwendu v. Ashcroft*, 112 Fed. Appx. 982, 983 (5th Cir. 2004) (unpublished) (per curiam) (citing *Arriaga-Barrientos v. INS*, 937 F.2d 411, 414 (9th Cir. 1991)); *see Jalloh v. Gonzales*, 418 F.3d 920, 923 (8th Cir. 2005). We cannot conclude that the BIA was required to find that the

---

[7] According to United States Department of State reports introduced into evidence by Qoku, the Yugoslavian Communist state broke up in 1991. Qoku is now a resident of Macedonia, which is a "parliamentary democracy with multiethnic party representation and a popularly elected president." U.S. Dep't of State, *Macedonia, The Former Yugoslav Republic of,* Country Reports on Human Rights Practices - 2001 (Mar. 4, 2002) (hereinafter "2001 Country Report").

several, decades-old incidents involving Qoku's father met this standard.

Second, Qoku introduced evidence that the Yugoslavian regime learned that he had attended demonstrations in favor of democracy in the United States and threatened to arrest him if he returned to Yugoslavia. Mere harassment and threats do not rise to the level of persecution. *Eduard v. Ashcroft*, 379 F.3d 182, 188 (5th Cir. 2004). In short, the BIA's implicit determination that Qoku has not suffered past persecution was not an abuse of discretion.

## 2. Well-Founded Fear of Future Persecution

Qoku argues that he presented a prima facie showing of a well-founded fear of future persecution. To establish that a fear of persecution is "well-founded," aliens must show that their fear is "objectively reasonable." *See Zhao v. Gonzales*, 404 F.3d 295, 307 (5th Cir. 2005). Qoku has not introduced any evidence that he would be singled out for persecution by the Macedonian government. Under such circumstances, an alien is required to establish

> a *pattern or practice* of persecution of a group of persons similarly situated . . . on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

*Id*. (emphasis added); 8 C.F.R. § 1208.13.

In support of his claim that changed circumstances in Macedonia demonstrated a well-founded fear of persecution, Qoku introduced a declaration from Dr. Bernd J. Fischer, a professor of Balkan history at Indiana University, Fort Wayne. He also attached

10

country reports from the United States Department of State and from two nongovernmental human rights organizations. The documents detail frequent incidents of police brutality against ethnic Albanians, which occasionally resulted in the death of the victims. The police often arbitrarily arrested and detained ethnic Albanians. They also occasionally abused and selectively enforced laws against members of opposition political parties. Paramilitary groups committed human rights abuses against ethnic Albanians and killed civilians. *See generally* 2001 Country Report.

Although these documents certainly "paint a picture of political turmoil, civil strife, and many human rights abuses," they also suggest that the worst abuses occurred during—and as a result of—the government's effort to contain an insurgency which ended in 2001. *Selimi*, 360 F.3d at 740 (addressing similar evidence of abuse against ethnic Albanians in Macedonia). Between February and July of that year, Albanian Nationalists engaged in brutal attacks against governmental forces. According to the Department of State, insurgents also beat and killed civilians and engaged in "ethnic cleansing." Record evidence suggests improvement in the Macedonian government's human rights record since the end of the Albanian Nationalist insurgency.

By August 2001, the government and insurgents had negotiated a cease-fire and "signed the Framework Agreement and its annexes, which laid the groundwork for the preservation of a peaceful,

11

unitary, multiethnic state with improved civil rights for minority groups." 2001 Country Report. In September 2001, the international community began training new police officers that were incorporated into more ethnically diverse units. Importantly, according the Helsinki Committee for Human Rights, the number of incidents of police brutality decreased during 2002, after the end of the conflict. Additionally, according to the latest evidence introduced by Qoku, two ethnic Albanian parties were part of the governing coalition.[8]

We do not mean to imply that serious governmental mistreatment of individuals similarly-situated to Qoku no longer occurs in post-insurgency Macedonia. In light of our extraordinarily deferential standard of review, however, we cannot conclude that Qoku established a prima facie case that the Macedonian government is currently engaged in a "pattern or practice" of persecution. The Seventh Circuit recently reviewed a motion to reopen on similar evidence. It held that an ethnic Albanian family failed to demonstrate "a prima facie case of a reasonable fear of future persecution" in Macedonia based on human rights abuses occurring during the insurgency. *See Selmi*, 360 F.3d at 741; *see also Hasanago v. Ashcroft*, 136 Fed. Appx. 424, 426 (2nd Cir. 2005)

_____

[8] Qoku provided comparatively little evidence that Muslims in Macedonia are persecuted on account of their religion. The evidence reveals religious tension in the country, but according to the Department of State, the *government* "generally respects" the right to religious freedom.

(unpublished) (affirming an IJ's ruling that an ethnic Albanian did not have a well-founded fear of persecution because "country condition reports" revealed that "the conflict between the Macedonian government and ethnic Albanians was abating"). In short, the BIA did not abuse its wide discretion in determining that Qoku had not shown a prima facie case for asylum.

## D.   Withholding of Removal

Qoku argued below that proceedings should be reopened for withholding of removal. Withholding of removal claims, like asylum claims, are exempt from the ordinary time restrictions on motions to reopen. *See* 8 C.F.R. § 1003.23(b)(4)(i). Applicants may qualify for withholding of removal by showing "more likely than not" that they would be persecuted or tortured in the future. 8 C.F.R. § 1208.16. Qoku claims on appeal that the BIA erroneously determined that he had not made a prima facie case for this relief.[9]

The "more likely than not" burden for withholding of removal is higher than the standard for asylum. *See Eduard* at 186 n.2. Furthermore, "torture is more severe than persecution . . . ." *Nuru v. Gonzales*, 404 F.3d 1207, 1224 (9th Cir. 2005); *Roy* 389 F.3d

---

[9] Appellee Gonzales argues on appeal that Qoku's CAT claim was untimely because it was not filed "within June 21, 1999," as required by the regulations implementing CAT. 8 C.F.R. § 1208.18. The BIA did not reject Qoku's CAT claim as untimely. It found that he had not made a prima facie case of torture. Accordingly, we must address this latter ground for denying Qoku relief under CAT.

13

at 140 ("CAT standard of torture" is a "more stringent," "higher bar" than persecution). Thus, since the BIA did not abuse its discretion in determining that Qoku did not make a prima facie case of persecution, *see supra* Part III.C, it necessarily did not abuse its discretion in finding that he had not made a prima facie case for withholding of removal.[10]

E.   **Review by Single BIA Member**

Lastly, Qoku claims that he was entitled to have the IJ's denial of his 2004 motion to reopen reviewed by a three-member panel. *See* 8 C.F.R. § 1003.1(e)(6) (*permitting* review by a three-member panel if, *inter alia*, an IJ decision "is not in conformity with the law") (emphasis added). This argument ignores that BIA regulations expressly provide that a single Board member may "issue a brief order affirming [or] *modifying*" the decision of an IJ. 8 C.F.R. § 1003.1(e)(5) (emphasis added). The BIA order under review explicitly adopted and affirmed the IJ decision. Qoku has not cited any authority for the proposition that the BIA must use a three-member panel in such a situation. Additionally, Qoku's contention that the IJ's decision was "not in conformity with the law" under section 1003.1(e)(6) is premised on arguments that we

---

[10] We recognize that claims for withholding of removal under CAT will not invariably be a subset of persecution claims. CAT claims, unlike persecution claims, do not require "any connection between the applicant's race, religion, nationality, membership in a particular social group, or political opinion" and the inflicted harm. *Roy*, 389 F.3d at 139-40.

have rejected above. Accordingly, the BIA did not err in hearing Qoku's appeal through a single Board member.

## IV. Conclusion

The IJ and BIA did not abuse their discretion in denying Qoku's motion to reopen. Qoku's petition for review is DENIED. His motion seeking a stay of removal pending review of his petition is DISMISSED as moot.