# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 24, 2021

Lyle W. Cayce
Clerk

No. 19-60807

Muntaser B. Abubaker Abushagif,

*Petitioner*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

Petition for Review of an Order of
the Board of Immigration Appeals
No. A 200 910 227

Before Smith, Higginson, and Engelhardt, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

Muntaser Abushagif, a Libyan national, applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") in September 2011. At his hearing, he voluntarily withdrew his application and agreed to pre-conclusion voluntary departure; the immigration judge ("I.J.") ordered him to leave the country by April 5, 2012. In 2019, Abushagif moved to reopen his proceedings, seeking the same relief on the basis that country conditions in Libya had worsened and that he feared reprisal for his role in the former regime's national guard. Moreover, he asserted that he had converted to Christianity and was bisexual and feared

No. 19-60807

persecution on those bases too.  The I.J. denied his motion, and the Board of Immigration Appeals ("BIA" or "Board") dismissed his appeal.  Abushagif petitioned for this court's review.  We grant in part, deny in part, and remand for the limited purpose of the Board's assessing his CAT claim.

I.

A.

Abushagif was admitted to the United States as a non-immigrant student but failed to carry a full course of study despite a condition that he do so.  For that reason, the Department of Homeland Security ("DHS") sought to have him removed in September 2010.

Shortly afterward, Libya was engulfed in a civil war that erupted in February 2011.  In September 2011, with the war raging in Libya but with Muammar Qadhafi still leading the country, Abushagif applied for asylum, withholding of removal, and protection under CAT.

In his application, Abushagif alleged that his brother had been jailed for declining to join Qadhafi's forces in killing civilians.  Abushagif was afraid that if he returned to Libya, he would be conscripted to fight for Qadhafi "against [his] own people," "just like . . . all young people in Libya."  Abushagif noted that Qadhafi's forces had asked his father about Abushagif's whereabouts.  Abushagif stated that he did not want to participate in the civil war.

In the part of his application for asylum and for withholding of removal that asked about political, religious, and military affiliations, Abushagif stated only that he had organized a group of friends to talk about Libyan politics and economics, and he explicitly disclaimed that that group had engaged in any subversive activities.  In response to a question that asked specifically about his involvement in "military or paramilitary group[s], civil patrol[s], [and] guerilla organization[s]," Abushagif failed to indicate that either he or

2

No. 19-60807

any family members had served in such entities.

With his application, Abushagif included a letter from his father that warned that Abushagif would be in danger if he returned to Libya. The letter explained that Qadhafi's forces had arrested Abushagif's older brother for refusing to harm civilians but that the brother was also an "outcast for not wanting to ally with the rebels." The letter stated that Abushagif's father had lost his business and was thus unable to support his son financially. Nowhere among those unfortunate statements did the letter suggest that Abushagif's father had ever worked for the Qadhafi regime.

In December 2011, the I.J. held a hearing on Abushagif's application. By that point, Qadhafi's administration had collapsed, and he had been killed by rebels. During the hearing, Abushagif chose to withdraw his application and agreed to pre-conclusion voluntary departure. The I.J. told him that he must leave the country by April 5, 2012.

B.

Abushagif did not leave, and in January 2019 he filed a motion to reopen and stay removal, requesting that his proceedings be reopened to allow him to apply for asylum, withholding of removal, and protection under CAT. Abushagif stated that the country conditions in Libya had materially changed for the worse since his original application. Moreover, he averred that he would be a target for persecution if he returned because of his and his family's status. Abushagif declared that his father had been kidnapped and tortured by militias because of his work for the Qadhafi administration and that those militias planned to kidnap him once he landed in Libya. Abushagif also stated that he feared torture or death because he had converted to Christianity and come out as bisexual. Finally, he stated that he feared persecution because he had served in the Qadhafi regime's national guard.

The I.J. denied the motion to reopen and stay removal. The I.J.

identified several inconsistences between Abushagif's initial application and his motion to reopen, as well as discrepancies between Abushagif's statements in the motion and his supporting documentation. Moreover, the I.J. determined that Abushagif had failed to meet his burden of showing that country conditions had materially changed and had failed to show that evidence of such changed conditions was not available at Abushagif's previous hearing. Relatedly, the I.J. concluded that much of the relevant information in Abushagif's motion to reopen—such as his and his father's service under the Qadhafi regime—could have been presented with his application in 2011.

In March 2019, Abushagif appealed to the BIA. Reviewing the denial, the BIA determined that the I.J. did not clearly err in concluding that there were materially inconsistent statements between Abushagif's initial application and his motion to reopen, specifically regarding his and his father's roles working for the Qadhafi administration and his involvement with a military group. The Board also concluded that the I.J. didn't clearly err in finding that Abushagif's claims about the kidnapping and torture of his father, as well as his father's assertion that his kidnappers had threatened Abushagif, contained serious inconsistencies. Unlike the I.J., the BIA acknowledged that conditions in Libya had worsened for those who had supported the Qadhafi administration, but because of the inconsistencies, the Board determined that Abushagif had failed to provide "persuasive evidence that he has a well-founded fear of persecution" because of his service in Qadhafi's national guard.

Moreover, the Board agreed with the I.J. that Abushagif had failed to provide corroborating evidence for his claims that he had converted to Christianity and that he was bisexual. The BIA rejected Abushagif's contention that his motion was "entitled to a presumption of truth," stating instead that it was his "burden" to "provid[e] credible and corroborating evidence that reveals a reasonable likelihood that the statutory requirements for relief have

been satisfied."

Because Abushagif had failed to provide such evidence, the BIA concluded that he had not established a *prima facie* case for relief and dismissed his appeal in September 2019.  Abushagif timely petitioned for this court's review in October 2019.  *See* 8 U.S.C. § 1252(a)(1), (b)(1).

## II.

### A.

"In reviewing the denial of a motion to reopen removal proceedings, we apply a highly deferential abuse-of-discretion standard."  *Nunez v. Sessions*, 882 F.3d 499, 505 (5th Cir. 2018) (per curiam).  We affirm the BIA's decision so long as "it is not capricious, without foundation in the evidence, or otherwise so irrational that it is arbitrary rather than the result of any perceptible rational approach."  *Gonzalez-Cantu v. Sessions*, 866 F.3d 302, 304–05 (5th Cir. 2017) (quoting *Gomez-Palacios v. Holder*, 560 F.3d 354, 358 (5th Cir. 2009)).  We review the BIA's legal conclusions *de novo*, however, "unless a conclusion embodies the Board's interpretation of an ambiguous provision of a statute that it administers."  *Singh v. Gonzales*, 436 F.3d 484, 487 (5th Cir. 2006).

In general, we have authority to review only the Board's decision, and we review the I.J.'s decision only where it "has some impact on the BIA's decision, as when the BIA has adopted all or part of the IJ's reasoning." *Enriquez-Gutierrez v. Holder*, 612 F.3d 400, 407 (5th Cir. 2010).  Moreover, we "may usually only affirm the BIA on the basis of its stated rationale."  *Id.*

### B.

The Immigration and Nationality Act of 1965 ("INA"), the relevant law here, "carefully limits an alien's ability to bring motions to reopen." *Qorane v. Barr*, 919 F.3d 904, 911 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 907

(2020). Normally, an alien may file only one such motion and must do so within ninety days of the entry of a final removal order. *See id.*; 8 U.S.C. § 1229a(c)(7). But there are exceptions to the ninety-day rule; indeed, there is no time limit if the motion's purpose "is to apply for asylum, withholding of removal, or CAT relief and the motion 'is based on changed country conditions arising in the country of nationality . . . if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding.'" *Ramos-Lopez v. Lynch*, 823 F.3d 1024, 1026 (5th Cir. 2016) (quoting 8 U.S.C. § 1229(c)(7)(C)(ii)) (omission in original). Because Abushagif's motion to reopen was based on changed country conditions, that exception applies here.

"There are at least three independent grounds on which the BIA may deny a motion to reopen." *INS v. Abudu*, 485 U.S. 94, 104 (1988). First, the Board may determine that the alien "has not established a prima facie case for the underlying substantive relief sought." *Id.* Second, the Board may determine that the alien "has not introduced previously unavailable material evidence, or, in an asylum application case, that the movant has not reasonably explained his failure to apply for asylum initially." *Id.* at 104–05 (citations omitted). Third, where "the ultimate grant of relief is discretionary," the Board can "simply determine that . . . the movant would not be entitled to the discretionary grant of relief." *Id.* at 105.

## III.

As a threshold matter, we must determine on what ground the BIA denied Abushagif's motion to reopen. Abushagif contends that the Board ruled only that he had failed to establish a *prima facie* case, but the government avers that the BIA also determined that Abushagif failed to present previously unavailable, material evidence. We conclude that the BIA dismissed only because he failed to establish a *prima facie* case.

No. 19-60807

To establish a *prima facie* case in a motion to reopen, an alien must show that there is a reasonable likelihood that he is statutorily eligible for the relief he seeks—here, asylum, withholding of removal, and protection under CAT.[1] In its order, the Board recited that test, stating that it was Abushagif's burden to prove his case. The Board concluded that he failed to do so because there were inconsistencies in his claims and supporting documentation and because he hadn't provided evidence to corroborate his conversion to Christianity or his bisexuality. The BIA observed that Abushagif hadn't "provided persuasive evidence that he has a well-founded fear of persecution" or shown that there was "a reasonable possibility of being persecuted." That language corresponds to the requirements for asylum. *See* 8 U.S.C. § 1101(a)(42).

On the other hand, the Board unequivocally found that Abushagif had met his burden to proffer previously unavailable evidence of changed conditions in Libya. Indeed, the Board "acknowledge[d] that conditions for individuals who formerly supported the Qadhafi government have worsened." The Board also accepted "that conditions have worsened for Christians and bisexual individuals in Libya."

The government points to one sentence in the Board's order in support of its contention that the BIA denied Abushagif's motion because he failed to produce previously unavailable evidence. The government notes that the Board stated that because "according to the respondent's father the events [described in his letter] occurred early in 2011, evidence pertaining to these events would have been available at the respondent's December 7, 2011, hearing." Contra the government's suggestion, however, the BIA made that observation as evidence of its conclusion that Abushagif's claims

---

[1] *See In re L-O-G-*, 21 I. & N. Dec. 413, 419 (BIA 1996); *see also Tejada-Reyes v. Garland*, 848 F. App'x 645, 646 (5th Cir. 2021) (per curiam).

contained inconsistencies; the BIA did not purport to deny Abushagif's motion because of his failure to present previously unavailable evidence. Thus, the sole ground for denial was Abushagif's failure to establish a *prima facie* case in his motion to reopen.

## IV.
### A.

Abushagif contends that the BIA abused its discretion in determining that he failed to establish a *prima facie* case for asylum eligibility and withholding of removal. We disagree.

Abushagif avers that the Board applied an incorrect legal standard in assessing his motion to reopen. He asserts that we should adopt the "inherently unbelievable" standard, requiring the Board to accept all facts alleged in a motion to reopen as true unless they are "inherently unbelievable." *See Hernandez-Ortiz v. INS*, 777 F.2d 509, 514 (9th Cir. 1985). Abushagif maintains that to fall short of that standard's forgiving bar, the facts alleged must be incredible or beyond belief. Indeed, under the standard, the "BIA's role in reviewing a motion to reopen is like a trial court's role in reviewing a motion for summary judgment." *Trujillo Diaz v. Sessions*, 880 F3d 244, 252 (6th Cir. 2018). The Board's review is thus meant "to isolate cases worthy of further consideration" instead of "assess[ing] the *credibility* of the evidence." *Haftlang v. INS*, 790 F.2d 140, 143 (D.C. Cir. 1986). Abushagif avers that because it denied his motion on account of inconsistencies in some of his assertions and for failing to provide corroborating evidence for others, the BIA erred by declining to apply a strong presumption in favor of the accuracy of his account and by assessing the credibility of the evidence he presented.

Abushagif points out that several of our sister circuits have adopted the "inherently unbelievable" standard. Indeed, although not all of them use

No. 19-60807

the term "inherently unbelievable,"[2] the First, Third, Sixth, Seventh, Ninth, and D.C. Circuits all *de facto* apply that standard.[3]

Abushagif avers that every other circuit to have considered the issue has adopted the test, but he misses that the en banc Fourth Circuit has, at least in part, rejected it.[4] In *M.A.*, 899 F.2d at 310, the court concluded that the summary judgment model was inappropriate even in conceptualizing the *prima facie* case. Requiring the BIA to construe the facts in the applicant's favor would have "effectively overwhelm[ed] the immigration authorities, perhaps the most heavily burdened officers in our government, by allowing aliens to bring eleventh hour appeals in an attempt to delay [removal]." *Id.*

## B.

The Supreme Court recently cautioned, in a similar context, that judges should not invent procedural requirements for the BIA. In *Garland v. Dai*, 141 S. Ct. 1669 (2021), the Court struck down another judge-made standard for the Board's review of the I.J.'s determinations. *Id.* at 1677. The Ninth Circuit's rule requiring the BIA to credit an alien's testimony absent an explicit adverse credibility determination by the I.J. was incompatible with the INA. *See id.* at 1681. "When it comes to questions of fact . . . the INA

---

[2] *See Gebremichael v. INS*, 10 F.3d 28, 40 (1st Cir. 1993) (not using the term "inherently unbelievable" but requiring the BIA to "accept as true the facts stated in an alien's affidavits." (cleaned up)).

[3] *See, e.g.*, *Shardar v. Att'y Gen. of U.S.*, 503 F.3d 308, 313 (3d Cir. 2007); *Trujillo Diaz*, 880 F.3d at 252–53; *Fessehaye v. Gonzales*, 414 F.3d 746, 755 (7th Cir. 2005); *Bhasin v. Gonzales*, 423 F.3d 977, 987 (9th Cir. 2005); *Haftlang*, 790 F.2d at 143.

[4] *See M.A. A26851062 v. INS*, 899 F.2d 304, 310 (4th Cir. 1990) (en banc), *superseded by statute on other grounds as stated in Peter v. Gonzales*, 210 F. App'x 303, 307 (4th Cir. 2006) (per curiam).

provides that a reviewing court must accept 'administrative findings' as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* at 1677 (quoting 8 U.S.C. § 1252(b)(4)(B)). The Court drew on the "settled" principle "that a reviewing court is 'generally not free to impose' additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel." *Id.* (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978)).

Although we now assess a different judge-made standard in the immigration and asylum context, *Dai* applies here. In *Dai*, the Court rejected judicially-created presumptions of credibility that were not found in the INA, concluding that "[t]he only question for judges reviewing the BIA's factual determinations is whether *any* reasonable adjudicator could have found as the agency did." *Id.* at 1678. And the Court did not throw a curveball in that holding; indeed, it has long stated that immigration authorities are entitled to substantial deference, including in the motion-to-reopen context.[5] That the Board must credit factual allegations as true in a motion to reopen unless they are "inherently unbelievable" is found nowhere in the INA or the relevant regulations. *See* 8 U.S.C. § 1229a(c)(7); 8 C.F.R. § 1003.23. We thus do not adopt the judge-made "inherently unbelievable" standard.

## V.

We decline to require that the BIA apply the "inherently unbelievable" standard when reviewing a motion to reopen for failure to state a *prima facie* case for the underlying relief sought. Instead, we now review the BIA's

---

[5] *See, e.g.*, *INS v. Doherty*, 502 U.S. 314, 323 (1992); *Abudu*, 485 U.S. at 106–10 (discussing the BIA's broad discretion in motions to reopen and stating that immigration authorities "should have the right to be restrictive" in that context, *id.* at 108 (quoting *INS v. Jong Ha Wang*, 450 U.S. 139, 144 n.5 (1981))).

No. 19-60807

decision for abuse of discretion. *See Gonzalez-Cantu*, 866 F.3d at 304. Again, under that deferential standard, we affirm the Board's determination unless it is "capricious, without foundation in the evidence, or otherwise so irrational that it is arbitrary rather than the result of any perceptible rational approach." *Id.* at 304–05 (quoting *Gomez-Palacios*, 560 F.3d at 358).

## A.

As a preliminary matter, we must determine whether Abushagif failed to exhaust his administrative remedies. The government avers that he failed to exhaust by raising an issue for the first time here that he did not raise on appeal to the BIA.

We may review a final order of the BIA after "the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). Because exhaustion is a statutory limitation, it is jurisdictional. *Omari v. Holder*, 562 F.3d 314, 324 (5th Cir. 2009). A "petitioner must raise, present, or mention an issue to the BIA to satisfy exhaustion." *Vazquez v. Sessions*, 885 F.3d 862, 868 (5th Cir. 2018) (cleaned up). Although that "requires some affirmative action by a party, . . . it is by no means a requirement that the arguments be identical." *Id.* Instead, the "key requirement . . . is that a petitioner must have presented an issue in some concrete way in order to put the BIA on notice of his claim," *id.*, and we only need to be able to "reasonably tie" the appellate theories to the petitioner's "concrete statement[s]" made to the Board, *Omari*, 562 F.3d at 322.

The government contends that Abushagif made different arguments before the Board and before this court regarding the contents of his father's letter. But Abushagif satisfied his exhaustion requirements. Before the Board, he complained that the inconsistencies that the I.J. identified regarding his father's letter were illusory. Although Abushagif focused on other issues, he mentioned and contested the I.J.'s findings about his father's

11

alleged torture and kidnapping.  That discussion was sufficient to "put the BIA on notice of his claim[s]," as evidenced by the fact that the Board ruled on them. *Vazquez*, 885 F.3d at 868.  Thus, Abushagif did not fail to exhaust his administrative remedies.

## B.

The Board did not abuse its discretion in denying Abushagif's motion to reopen because its determination that he failed to establish a *prima facie* case was not irrational. *See Gonzalez-Cantu*, 866 F.3d at 304–05.  First, it was not unreasonable for the BIA to determine that, because of inconsistencies in his account and supporting documentation, Abushagif failed to meet his burden in showing that he would face political persecution if he returned to Libya.  Second, the Board did not act irrationally in concluding that, by failing to produce corroborating evidence of his religious conversion and bisexual orientation, Abushagif hadn't shown a reasonable possibility of persecution for either status.

## 1.

The Board did not abuse its discretion in finding that Abushagif's assertions regarding his fear of political persecution were inconsistent, unreliable, and therefore insufficient.  The BIA discussed three inconsistencies in his account and documents, involving Abushagif's service in Qadhafi's national guard, his father's leg wound, and the timing of his father's abduction and related threats against Abushagif.  Abushagif maintains that the discrepancies surrounding all three can be reconciled.

First, the BIA noted a serious omission in Abushagif's account of his military service.  In 2011, Abushagif did not mention any such service despite answering a question that specifically asked whether he had engaged in any military or paramilitary organizations.  In his motion to reopen, however, Abushagif claimed that he had served in the national guard from 2005 to

2007. He suggests that it is plausible that he may have misunderstood the question. He also asserts that, because Qadhafi still ruled Libya when Abushagif completed the form in early 2011, he did not think he had to list his service because there was little reason at the time to believe his service would give rise to political persecution. But the question was clear and unequivocal; it in no way suggested that an applicant could omit military service if he did not think it was relevant to his case. The Board's review of the evidence of Abushagif's inconsistency here was far from irrational.

Second, the Board affirmed the I.J.'s finding of a material inconsistency regarding Abushagif's father's leg amputation; although Abushagif claimed that his father lost his leg from torture at the hands of militias provoked by his work for the Qadhafi regime, the medical evidence accompanying Abushagif's motion stated that the amputation resulted from a preexisting medical condition. Abushagif contends that those facts can be reconciled because it is plausible that torture exacerbated the underlying condition and thus caused the amputation. Moreover, he avers that one overlooked condition listed in the medical report is plausibly consistent with torture. Finally, Abushagif suggests that perhaps the medical report omits any mention of torture because his father was afraid to tell his medical examiners the true cause of his injury.

But we do not require the BIA to engage in speculative gymnastics to reconcile conflicts in an applicant's account. The Board's view of the evidence was in no way irrational.

Finally, the BIA also affirmed the I.J.'s finding that there were serious inconsistencies in Abushagif's account of his father's kidnapping and those kidnappers' threats against Abushagif. The Board noted that in his September 2011 asylum application and at his December 2011 hearing, Abushagif failed to include both the militia's threats against him and his father's kid-

napping.  Instead, his 2011 application stated only that Qadhafi's forces had arrested Abushagif's brother, omitting any mention of his father's abduction and militia threats against Abushagif.

Abushagif contends that the BIA unfairly construed the timing of his father's abduction, emphasizing that his father's letter states that he was kidnapped "[a]fter" the 2011 revolution began instead of stating a specific timeframe that he was abducted.  Thus, Abushagif surmises, the kidnapping could easily have occurred after his application and hearing in 2011.  But Abushagif overlooks that the letter also states that "[i]n 2011 at the outbreak of February 17 revolution, [Abushagif] [] received death threat[s] if he returned to Tripoli by militias who captured his father."

Setting aside the question of whether it was reasonable for the BIA to infer that that statement implies the kidnapping and threats occurred at the same time, at the very least the statement indicates that the militia threatened Abushagif in early 2011—at the "outbreak" of the revolution.[6]  Because Abushagif filed his asylum application in September 2011, it wasn't irrational for the Board to view his father's statement involving his kidnapping and threats against Abushagif as creating an inconsistency between Abushagif's motion to reopen and his initial application.

In sum, the BIA did not act irrationally in determining that Abushagif's allegations relating to his military service, threats against him, and alleged persecution of his family were inconsistent and unreliable.  *See Gonzalez-Cantu*, 866 F.3d at 304–05.  Thus, there was no abuse of discretion

---

[6] Merriam-Webster defines "outbreak" as "a sudden or violent increase in activity."  *Outbreak*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/outbreak (last visited Aug. 18, 2021).  Stating that the militia made threats "at the outbreak" suggests that those threats occurred near the beginning of that sudden activity.

in declining to credit them.

2.

Abushagif avers that the Board abused its discretion by not accepting his claims of being a Christian and a bisexual man without corroboration. We disagree.

The controlling regulation stipulates that a motion to reopen "shall be supported by affidavits and other evidentiary material." 8 C.F.R. § 1003.23(b)(3). Although Abushagif supplied his own affidavit attesting to his conversion to Christianity and bisexual status, the Board determined that that was insufficient and cited the need for corroborating evidence, such as a baptismal certificate or his ex-wife's testimony as to his faith, as well as evidence such as affidavits confirming his bisexuality from men with whom he claimed to have had relationships. The BIA may require that a motion to reopen "provide corroborating evidence where it is reasonable to do so." *Bizabishaka v. Mukasey*, 307 F. App'x 824, 825 (5th Cir. 2009) (per curiam). Thus, the BIA did not abuse its discretion by requiring additional corroboration beyond Abushagif's own testimony to establish a *prima facie* case of political persecution. *See id.*

VI.

Abushagif contends that the BIA abused its discretion by entirely failing to address his CAT claim. On that point, he is correct. A CAT "claim is separate from . . . claims for asylum and withholding of removal and should receive separate analytical attention." *Efe v. Ashcroft*, 293 F.3d 899, 906–07 (5th Cir. 2002). Moreover, the BIA must not leave asserted CAT claims unaddressed. *See Eduard v. Ashcroft*, 379 F.3d 182, 196 (5th Cir. 2004).

The government does not dispute that Abushagif raised a CAT claim in his motion to reopen. The government avers, however, that Abushagif did

not present his claim to the Board and thus failed to exhaust it. *See* 8 U.S.C. § 1252(d)(1). That is flatly incorrect; Abushagif raised his CAT claim several times in his briefing before the BIA. It is confounding that the government says otherwise.

The government also contends that remanding the CAT claim would be "futile" because, even if the BIA had addressed it, the Board still would not have granted his motion to reopen, given its determination that Abushagif had generally failed to submit reliable evidence in support of his claims of persecution. That contention, however, cannot overcome the plain command of our caselaw: The Board must address CAT claims where they are raised. *See Eduard*, 379 F.3d at 196.

We therefore remand for the limited purpose of the Board's addressing Abushagif's CAT claim. *Cf. United States v. Phipps*, 319 F.3d 177, 192 (5th Cir. 2003); *Ozee v. Am. Council on Gift Annuities, Inc.*, 143 F.3d 937, 941 (5th Cir. 1998). We "retain[] jurisdiction of the appeal during the pendency of the limited remand." *United States v. Rocha*, 164 F. App'x 481, 482 (5th Cir. 2006) (per curiam).

Accordingly, the petition for review is GRANTED in part and DENIED in part. The matter is REMANDED to the BIA for the limited purpose of addressing the CAT claim.