United States Court of Appeals
Fifth Circuit

**F I L E D**

April 17, 2006

Charles R. Fulbruge III
Clerk

In the

United States Court of Appeals
for the Fifth Circuit

_____

№ 05-60141

_____

LAOI SALAH MAJD; RAJAA TAHSIN NAJI BARAKAT; TAREQ LAOI MAJD,

Petitioners,

VERSUS

ALBERTO R. GONZALES,
UNITED STATES ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of
the Board of Immigration Appeals

_____

Before KING, SMITH, and BENAVIDES,
   Circuit Judges.

JERRY E. SMITH, Circuit Judge:

   The petition for panel rehearing is GRANTED. The opinion, 2006 U.S. App. LEXIS 7558 (5th Cir. Mar. 8, 2006), is WITHDRAWN, and the following opinion is substituted:

* * * * *

   Laoi Majd, together with his wife and son as derivative beneficiaries, petitions for review of the denial by the Board of Immigration Appeals ("BIA") of his application for asylum, witholding of removal, and protection under the Convention Against Torture ("CAT"). We deny the petition.

## I.
### A.

Majd, a native of Libya holding a Palestinian Authority ("PA") passport, was admitted to the United States in January 2002 as a non-immigrant visitor. He overstayed his visa and in April 2003 was charged by the Department of Homeland Security ("DHS") with removability under 8 U.S.C. § 1227(a)(1)(B) for remaining in the country longer than permitted. In a September 2003 hearing before an immigration judge ("IJ"), Majd conceded he was removable as charged but requested asylum, witholding of removal, and protection under CAT, or, in the alternative, voluntary departure, claiming he was entitled to all such relief because, as a Palestinian living in the West Bank, he had been persecuted by Israeli forces.

### B.

Majd testified as follows: Before entering the United States, he and his family lived in Ramallah, where he and his wife were bankers. In March 2000, on returning to the West Bank from a vacation in Jordan, he was stopped by Israeli security forces at a checkpoint and detained for hours. He did not say why he was detained, but he claimed that the security forces kicked him while walking up and down the corridor where he was being held and that they questioned him about his job, family, and party affiliations. While he was being detained, his wife, one month pregnant, had to sit in a chair for eight hours without food or water.

In May 2000, Majd was arrested while on his way to pick up his sister, was detained for two hours, and again was questioned regarding his destination, family, job, and affiliations. He stated that on both occasions when he was detained, he presented the security forces with an identification card indicating that he was a low security risk.

In March 2001, as he was leaving the bank where he worked, Majd noticed tanks and soldiers in the street. The soldiers were "shooting from everywhere." Majd and another person tried to leave the area but were confronted by an Israeli soldier who demanded to know their destination. Majd stated he was going home, but the soldier ordered him back inside the bank.

When the soldier was distracted by one of his comrades, Majd and the other person tried to escape. The soldiers ordered them to stop, but when they did not obey the soldiers fired upon them. The other individual was shot, but Majd made it home safely. Majd testified that he had done nothing to deserve detention but confirmed that the building in which he worked housed the office of a Fatah leader.

In August 2001, Majd took a taxi from Ramallah to visit his father. While his taxi was in line at a security checkpoint, another taxi tried to change lanes and pass in front of another car. Because getting out of a checkpoint line is generally considered suspicious activity, the Israeli forces opened fire. A passenger riding in the same taxi as Majd was shot and killed, and Majd fainted out of fear. Majd eventually reached his destination and did not testify that the Israeli forces were shooting specifically at him.

The PA occupied the ground floor and basement of the building in which Majd lived. One day, after inspecting the location and suspecting that some PA soldiers has escaped through the building, Israeli soldiers searched the building from top to bottom, including Majd's home. The soldiers broke some objects there, and Majd's family was terrified, particularly after hearing shots fired in the

building. It was that event that prompted Majd and his family to take a vacation to the United States to "wait for the situation [in the West Bank] to get better."

After Majd his wife and son fled to the United States, numerous problems befell his family remaining in the West Bank. His cousin was detained by Israeli forces, and the cousin's blacksmith shop was destroyed. Majd's brother was detained for three months under an Israeli law that permits judges to authorize administrative detention for that length of time.[1] Majd's family, who raised vegetables in addition to holding other jobs, could not bring their harvest to market because of the general unrest in the area and the fact that "everything is closed and surrounded by Israeli authorities." In particular, the wall the Israelis are building to secure the West Bank border runs through the middle of his family's olive groves, depriving them of their land.

Majd offered the testimony of his brother, Modard Salah Jousef Majd, via telephone. The brother confirmed that he had been taken and detained for three months by the Israelis after telling them that Majd had gone to the United States. He also confirmed the destruction of the family's olive groves and stated that because of his experiences, he is essentially confined to his village. The telephonic testimony of Majd's father similarly confirmed Majd's accounts.

Majd also offered the testimony of Emily Watchsmann, a student at the University of North Texas who had visited the West Bank in conjunction with an organization known as the International Solidarity Movement. Watchsmann commented on the general conditions of unrest in the West Bank but stated that she had no personal knowledge of Majd's experiences and had never been to Ramallah. She explained the usual procedure at security checkpoints and suggested that any vehicle that attempted to evade a checkpoint would be fired upon.

II.

After hearing this evidence, the IJ denied Majd's applications for asylum, witholding of removal, and relief under CAT but granted him voluntary departure, allowing him sixty days to leave the country of his own accord.[2] The IJ ordered Majd forcibly removed to Israel if he did not depart during that sixty-day period.

The IJ determined that although Majd was credible, the mistreatment he suffered did not constitute persecution on account of one of the five statutory grounds that rendered an individual eligible for asylum and/or witholding of removal. The IJ found that the harm inflicted on Majd did not rise to the level of torture, so relief under CAT was unavailable.

Majd appealed to the BIA, contending that the IJ erred in denying him relief, that the rejection of his request for relief contravenes the 1951 Convention Relating to the Status of Refugees, and that the United States' handling of Palestinian asylum claims such as his violates the *ABC* Settlement Agreement, which arose out of a class action lawsuit by immigrants of certain nationalities against the immigration authorities. The BIA affirmed without opinion. Majd petitions for review.

---

[1] Majd did not testify that his brother was mistreated during his period of detention.

[2] By statute, permission to depart the United States voluntarily at the conclusion of removal proceedings "shall not be valid for a period exceeding 60 days." 8 U.S.C. § 1229c(b)(2).

### III.
### A.

Generally, we have authority to review only the decision of the BIA, but where, as here, the BIA summarily affirms the IJ's decision without opinion, we review the IJ's decision. *See Mikhael v. INS*, 115 F.3d 299, 302 (5th Cir. 1997). Although we review the legal conclusions of the BIA and the IJ *de novo*, *see id.*, we review their factual findings for substantial evidence. *See Zhang v. Gonzales*, 432 F.3d 339, 343-44 (5th Cir. 2005). Under the substantial evidence standard, "reversal [of the IJ] is improper unless we decide 'not only that the evidence supports a contrary conclusion, but [also] that the evidence *compels* it.'" *Id.* at 344 (quoting *Zhao v. Gonzales*, 404 F.3d 295, 306 (5th Cir. 2005)). The alien bears the burden of proving the requisite compelling nature of the evidence. *See Chun v. INS*, 40 F.3d 76, 78 (5th Cir. 1994).

### B.

The Attorney General has complete discretion whether to grant asylum to eligible individuals. "[A]sylum is not available to every victim of civil strife, but is restricted to those persecuted for particular reasons." *Hallman v. INS*, 879 F.2d 1244, 1247 (5th Cir. 1989). To be eligible for asylum, an alien must prove that he is "unable or unwilling to return to . . . [his home] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

"Neither discrimination nor harassment ordinarily amounts to persecution under the [Immigration and Nationality Act ("INA")] . . . ." *Eduard v. Ashcroft*, 379 F.3d 182, 188 (5th Cir. 2004). Similarly, "[p]ersecution is not a limitless concept . . . . [I]t does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional. If persecution were defined that expansively, a significant percentage of the world's population would qualify for asylum in this country—and it seems most unlikely that Congress intended such a result. Persecution must be extreme conduct to qualify for asylum protection." *Al-Fara v. Gonzales*, 404 F.3d 733, 739 (3d Cir. 2005) (internal quotations and citations omitted).

There is a well-founded fear of persecution if the alien has a subjective fear of persecution that is objectively reasonable. *See Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 445 (5th Cir. 2001). "[A]n applicant's fear of persecution cannot be *based solely* on general violence and civil disorder." *Eduard*, 379 F.3d at 190.

Unlike asylum, witholding of removal is not discretionary. An alien may not be removed to a particular country if it is determined that "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). To be eligible for witholding of removal, an alien must demonstrate an objective "clear probability" of persecution in the proposed country of removal. *INS v. Stevic*, 467 U.S. 407, 413 (1984). Because the level of proof required to establish eligibility for witholding of removal is higher than that required for asylum, failure to establish eligibility for asylum is dispositive of claims for witholding of removal. *See Eduard*, 379 F.3d at 186 n.2.

To obtain relief under CAT, an alien must demonstrate not that he is a member of one of the five protected categories of individuals articulated in the eligibility standards for asylum and witholding of removal, but rather that it is

4

more likely than not that he will be tortured if he is removed to his home country. *See Efe v. Ashcroft*, 293 F.3d 899, 907 (5th Cir. 2002).[3] To meet this burden, the alien may produce evidence of past torture, an inability to relocate to a safer part of the country, human rights abuses committed within the country, and any other relevant information. *See* 8 C.F.R. § 208.16(c)(3).

IV.

A.

The IJ determined that Majd was ineligible for asylum and withholding of removal because the evidence demonstrated that his suffering was the result of the generally dangerous conditions in the West Bank and did not rise to the level of persecution on account of one of the five statutorily-protected grounds. For example, with regard to the March 2001 incident at Majd's place of employment, the IJ found that the evidence suggested that the Israelis were attempting to apprehend a suspected terrorist in the area and that they fired on Majd not because he was a Palestinian, but because he disobeyed a soldier's order.

---

[3] The relevant regulation defines torture as

as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1) (2000).

The IJ found that the search of Majd's house was not an action directed specifically at Majd because of his race, nationality, religion, political affiliation, or membership in a social group. Rather, the Israeli forces were looking to apprehend other individuals believed to be hiding in the building, an operation that required a search of the entire building.

Similarly, the IJ concluded that Majd was a mere bystander to the shooting incident at the security checkpoint. That action by the Israeli forces was again not directed specifically at Majd, but was precipitated by the suspicious activity of the occupants of another vehicle. The IJ also found that the frustration of the Majd family's attempts to bring their harvest to market and the destruction of the family's olive groves were caused by the pervasive unstable conditions in the region, not by Israeli actions directed at the family in particular.

With regard to the two occasions on which Majd was detained, the IJ found that he did not suffer any long-term deprivation of liberty or permanent physical injury. Accordingly, the IJ concluded that though the detentions could be considered harassment, they did not constitute persecution.

Finally, the IJ determined that the detention of Majd's brother and cousin shed no light on how Majd would likely be treated on returning to Israel, because those detentions were the result of circumstances specific to each man.[4] Given that none of Majd's suffering rose to the

---

[4] Majd's brother was detained because the Israelis were investigating reports that there was a weapons manufacturing facility located in the building in which he lived. Majd's cousin was detained and his blacksmith shop destroyed because the Israelis suspected he was using the shop to manufacture weapons.

level of persecution on account of one of the five relevant statutory factors, the IJ concluded that Majd did not have a well-founded fear of future persecution.

The record fully supports the IJ's determination regarding Majd's ineligibility for asylum and witholding of removal, and Majd points to no evidence that compels any contrary conclusion. Indeed, every piece of evidence presented by Majd indicates that he and his family have been the victims of circumstance, not the special targets of brutality. As another circuit stated with regard to a region living under disorder similar to that existing in the West Bank, "[t]he general political upheaval that has been the unfortunate reality in Gaza is obviously threatening for those who live there, but such conditions in and of themselves do not merit asylum." *Al-Fara*, 404 F.3d at 742. Accordingly, we have no basis to question the IJ's denial of asylum and withholding of removal.

### B.

With regard to Majd's claim for relief under CAT, the IJ found that none of the harm done to Majd constituted "severe pain or suffering . . . *intentionally inflicted* [upon him] for such purposes as obtaining from him . . . or a third person information or a confession, punishing him . . . for an act he . . . or a third person has committed or is suspected of having committed, or intimidating or coercing him . . . or a third person, or for any reason based on discrimination of any kind . . . ." 8 C.F.R. § 208.18(a)(1) (2000) (emphasis added).

Again, Majd has brought forth no evidence that compels us to reverse the IJ. Most of the suffering he described was inflicted without any specific intent on the part of the Israeli forces in the West Bank. Additionally, on the two occasions when Majd was detained, the harm inflicted by the Israelis, although intentional and for the purpose of extracting information, did not rise to the level of severe pain or suffering. Majd was held for only a short time, and although he was not treated particularly well, it cannot be said that roughing an individual up and questioning him about his work, family, and political affiliations amounts to torture.

Similarly, the Israeli soldiers were certainly intending to harm Majd when they shot at him outside the bank. They did not so intend, however, with a discriminatory purpose or a goal of extracting information or a confession from Majd, but rather because they were trying to halt his escape. Thus, Majd's claim for relief under CAT fails.

### V.

Majd contends, in addition, that he qualifies as a refugee pursuant to the 1951 Convention Relating to the Status of Refugees (the "1951 Convention") and attendant United Nations protocol. On that basis, he asserts that the denial of his request for relief contravenes the Convention. He further argues that the handling of Palestinian asylum claims such as his violates the *ABC* Settlement Agreement, which arose out of a class action lawsuit by immigrants from El Salvador and Guatemala challenging the manner in which United States immigration authorities processed asylum claims filed under § 208(a) of the INA. *See Am. Baptist Churches v. Thornburgh*, 760 F. Supp. 796, 799 (N.D. Cal. 1991). Both of these claims are meritless.

As the Third Circuit has explained in detail,

Petitioner's claim that he qualifies as a refugee pursuant to the 1951 Convention and the 2002 interpretations of the United Nations High Commissioner for Refugees

made thereto is without merit. The United States is a signatory to the 1967 United Nations Protocol Relating to the Status of Refugees ("1967 Protocol"), which incorporated the 1951 Convention. The Attorney General implemented regulations to comply with its terms. In 1980, Congress amended the INA through passing the Refugee Act, which brought the domestic laws of the United States into conformity with its treaty obligations under the 1967 Protocol. The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation. Accordingly, [p]etitioner cannot assert rights beyond those contained in the INA and its amendments.

*Al-Fara*, 404 F.3d at 742-43 (internal citations omitted). We find the reasoning of the Third Circuit persuasive and adopt it here.

The *ABC* Settlement Agreement arose out of a class action lawsuit by immigrants from El Salvador and Guatemala challenging the manner in which United States immigration authorities processed asylum claims filed under § 208(a) of the INA. *See Am. Baptist Churches v. Thornburgh*, 760 F. Supp. 796, 799 (N.D. Cal. 1991). The agreement entitles class members to new proceedings before the immigration authorities if certain conditions are met, but it specifies that the class includes only "all Salvadorans in the United States as of September 19, 1990," and "all Guatemalans in the United States as of October 1, 1990." *Id*. Because Majd is not a member of the class, he cannot assert rights under the agreement.

The petition for review is accordingly DENIED.

7