# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 13, 2025

Lyle W. Cayce
Clerk

No. 24-60392

Miguel Angel Montiel Rubio,

*Petitioner*,

*versus*

Pamela Bondi, *U.S. Attorney General*,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals
Agency No. A213 583 007

Before Stewart, Clement, and Wilson, *Circuit Judges*.
Edith Brown Clement, *Circuit Judge*:

Miguel Angel Montiel Rubio is a Venezuelan citizen who faces deportation after overstaying his visa. An Immigration Judge determined Rubio failed to demonstrate eligibility for asylum, withholding of removal, or protection from the Convention Against Torture before ordering his removal from the United States. The Board of Immigration Appeals upheld the Immigration Judge's findings.

Rubio filed this petition for review. For the reasons that follow, Rubio's petition is DENIED.

No. 24-60392

I

Petitioner Miguel Angel Montiel Rubio, a sixty-year-old native and citizen of Venezuela, entered the United States through Miami, Florida, on or about June 6, 2019. Rubio received a B-2 visitor visa, which allowed him to remain in the country with legal status for no longer than six months. He applied for asylum on October 7, 2019, about sixty days before his visa was set to expire. Rubio remained in the country after his visa's expiration, prompting the Department of Homeland Security to issue a Notice to Appear alerting him of his removability under Section 237(a)(1)(B) of the Immigration and Nationality Act, codified at 8 U.S.C. § 1227(a)(1)(B).

In mid-2022, Rubio testified as the sole witness during his immigration hearing, where he admitted his removability. He stated his motivation for seeking asylum was his fear of past and future persecution related to his political affiliation and membership in particular social groups. Specifically, Rubio identified himself (1) as an opponent of the Revolutionary Party in Venezuela, (2) as an activist outwardly opposed to the Maduro regime, and (3) as a member of the Primero Justicia Party. Rubio feared persecution by a paramilitary group known as the "colectivos" because of his past political activism against the country's governing regime. As a member of the opposition Primero Justicia Party, he participated in approximately forty protests between 2010 and 2019, as well as other demonstrations.

The protests and demonstrations in which Rubio participated at times devolved into chaos. Before Venezuela's national assembly election in late 2015, for example, Rubio was shot in the leg by the colectivos as he chanted "viva Venezuela libre" and mobilized voters to the polls. When the gunman pulled the trigger, he yelled "take this so you stop fucking with us," and threatened to kill Rubio if he ever reported the shooting to the police. Rubio

underwent surgery the next day before being confined to a bed in his father's home for months to heal. He also underwent physical therapy, resulting in a year-long recovery.

Rubio returned to his own home in 2017—and to political activism in protest of an election some observers perceived as an unlawful attempt by the governing regime to replace the duly-elected national assembly. Mass demonstrations ensued, including roadblocks set up by protestors like Rubio "with the goal of stopping that election [viewed as] completely illegal." Around this time, one of Rubio's neighbors suffered a housefire set by the protestors because of her sympathy toward the ruling Venezuelan political party. The neighbor accused Rubio of helping set the fire, but Rubio denied any involvement and instead has blamed a group of younger protestors. The colectivos later penetrated the roadblocks and threatened to "burn [Rubio] alive" for his involvement.

Rubio traveled freely between Venezuela and the United States three times in 2017 and 2018. He testified that he did not request asylum during those trips because "no other [violent] events ha[d] happened" apart from the shooting, and he did not want to leave his own country permanently at the time.

In 2019, Rubio again participated in protests of the Venezuelan government, where the colectivos took photographs of the protestors, and the "National Guard and police" twice dropped tear gas to disperse the crowds.

Months later in May 2019, Rubio's neighbor relayed to him that an individual stopped by his home asking about an electric fence. Rubio suspected the individual was part of the colectivos, causing him to flee to the United States. Although Rubio concedes he intended to return after a short time, he changed his mind following a later interaction between his neighbor

and the colectivos. When Rubio's neighbor checked on his home that July, the neighbor encountered suspected members of the colectivos who shot gunfire into the air and shouted, "we got you, we located you, you damn bald man!" before realizing the individual was not Rubio. Rubio then decided to stay in the United States, fearing he could not return to Venezuela without being killed or relocate elsewhere within the country as an anti-regime political activist. He also argued he could not obtain employment in Venezuela because any company he worked for might share his information with the colectivos.

Rubio acknowledged there were several multi-year periods where he lived in Venezuela with either his father or his cousin unharmed as a political activist. His father now has passed away and he does not believe he could live with his cousin for an extended period. Rubio does not believe his home, which has been sitting empty since 2019, has been vandalized or otherwise rendered uninhabitable.

The Immigration Judge found Rubio's testimony credible but denied his applications for relief after determining he had not met his burden of proof. After reviewing his asylum application, the Immigration Judge determined the harms Rubio experienced at the hands of the colectivos "individually and in the aggregate[] do not rise to the requisite level of severity necessary to constitute persecution, particularly when considering that these events took place over a nine-year period where [Rubio] was involved in opposing the government." The Immigration Judge observed Rubio recovered from his gunshot wound and reasoned that although he was threatened by the colectivos years later, those events occurred "in the context of a larger scale protest." The Immigration Judge also concluded the "threats were nonspecific[,] . . . lack[ed] immediacy," and were not accompanied by any additional serious harm to Rubio.

The Immigration Judge also determined that Rubio did not have a well-founded fear of future persecution. The Immigration Judge reasoned that Rubio "did not believe he was being persecuted, nor did he fear future persecution" as he traveled to and from the United States, evidenced further by his continued participation in political protests each time he returned to Venezuela.

Because Rubio failed to meet the lower burden of proof for asylum, the Immigration Judge concluded that he necessarily failed to demonstrate the higher standard of eligibility for withholding of removal.

As for his application for protection based on the Convention Against Torture ("CAT"), the Immigration Judge acknowledged "widespread human rights abuses in Venezuela, particularly against opposition leaders and significant opposition voices." However, the Immigration Judge concluded "there [wa]s insufficient evidence in the record to establish that it is more likely than not that [Rubio] would personally be at risk of torture at the instigation of or with the consent or acquiescence of the Venezuelan government." In support, the Immigration Judge acknowledged Rubio had been a political activist but concluded there was no record evidence the "Venezuelan government ever specifically identified him as an opposition leader, politician, or significant voice such that it [wa]s more likely than not that he would be tortured if returned to Venezuela." The Immigration Judge further noted that Rubio had been able to travel "freely" between Venezuela and other countries and that he owned a home that had not been "seized" or "damaged." Accordingly, the Immigration Judge determined that Rubio had not demonstrated eligibility for CAT protection.

Rubio faced removal after not obtaining relief, so he appealed the Immigration Judge's decision to the Board of Immigration Appeals ("BIA").

No. 24-60392

The BIA was unpersuaded by Rubio's argument that the Immigration Judge erred in finding he had not suffered past persecution, noting that even considering his encounters with the colectivos cumulatively, the threats and gunshot wound he suffered "did not rise to the level of severity necessary to constitute persecution." The BIA also rejected Rubio's contention that the Immigration Judge's past-persecution determination was based solely on his eventual recovery from his gunshot wound.

The agency then affirmed the Immigration Judge's finding that Rubio had not established an objectively reasonable and well-founded fear of future persecution. It concluded, *inter alia*, that the Immigration Judge "permissibly found that although [Rubio] participated in political activities over the years, the record did not suggest the Venezuelan government ever identified him such that he would be targeted for persecution" upon his return to an environment where background conditions had worsened. The agency also credited Rubio's ability to travel to and from the United States freely, as well as the undamaged condition of his home, with the Venezuelan government's lack of interest in harming him.

The BIA therefore declined to disturb the Immigration Judge's denial of asylum, and by extension, his application for withholding of removal.

The agency similarly affirmed the Immigration Judge's denial of Rubio's application for CAT protection, concluding he had not shown he faced an individualized and targeted risk of torture.

It declined to review any other issue on appeal.[1] Rubio then filed a timely petition for review.

_____

[1] "As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach." *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam).

No. 24-60392

II

Our court's precedent "make[s] clear that we use the 'substantial evidence' standard, even when the agency determines the alien is credible and accepts his version of the facts." *Gjetani v. Barr*, 968 F.3d 393, 396 (5th Cir. 2020). Under this deferential standard, we will not grant an alien's petition unless the evidence "compels" a contrary conclusion to the factual determinations reached by the Immigration Judge. *Zhao v. Gonzales*, 404 F.3d 295, 306 (5th Cir. 2005); 8 U.S.C. § 1252(b)(4)(B). As part of an applicant's burden, he must show "that the evidence is so compelling that no reasonable factfinder could reach a contrary conclusion." *Bertrand v. Garland*, 36 F.4th 627, 631 (5th Cir. 2022) (quoting *Chen v. Gonzales*, 470 F.3d 1131, 1134 (5th Cir. 2006)).

We review de novo the BIA's legal conclusions. *See id.* at 631. If the Immigration Judge's reasoning influenced the BIA's decision, we consider that judge's decision. *Mejia-Alvarenga v. Garland*, 95 F.4th 319, 323 (5th Cir. 2024).

III

A

Asylum is reserved for individuals "who are the specific targets of persecution." *Gjetani*, 968 F.3d at 395 (cleaned up); *see* 8 C.F.R. § 208.13(b). The scheme created by Congress "vested broad discretion in the Executive Branch to make asylum determinations, and instructed courts to give significant deference to [those] decisions." *Gjetani*, 968 F.3d at 395. Indeed, "[t]he Attorney General has complete discretion whether to grant asylum to eligible individuals." *Majd v. Gonzales*, 446 F.3d 590, 595 (5th Cir. 2006).

An applicant for asylum must first establish he is a "refugee." 8 U.S.C. § 1158(b)(1)(B)(i). To qualify as a refugee, the applicant must show

7

that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." *Id.* The refugee must then prove "he suffered past persecution or has a well-founded fear of future persecution" to qualify for asylum. *Dayo v. Holder*, 687 F.3d 653, 657 (5th Cir. 2012).

"[A]sylum is not available to every victim of civil strife, but is restricted to those persecuted for particular reasons." *Majd*, 446 F.3d at 595 (alteration in original) (quotations omitted). Our court has emphasized that

> persecution is not a limitless concept . . . . It does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional. If persecution were defined that expansively, a significant percentage of the world's population would qualify for asylum in this country— and it seems most unlikely that Congress intended such a result.

*Id.* (cleaned up). As our court recently observed, "[p]ersecution *always* requires an 'extreme' level of conduct—no matter if the alleged mistreatment is physical or not." *Rangel v. Garland*, 100 F.4th 599, 604 (5th Cir. 2024). This "means a systematic, sustained pattern of assaults or other acts of oppression—not individual or even a handful of assaults or threats." *Gjetani*, 968 F.3d at 395.

As a general matter, "[p]ersecution refers to harm inflicted either by the government or by private actors whom the government 'is unable or unwilling to control.'" *Bertrand*, 36 F.4th at 631 (quoting *Sanchez-Amador v. Garland*, 30 F.4th 529, 533 (5th Cir. 2022)). To prove that a government is unable or unwilling to protect against private persecution, an applicant for asylum "must show that the government condoned the private violence 'or at least demonstrated a complete helplessness to protect the [applicant.]'"

*Id.* at 631–32 (alteration in original) (quoting *Shehu v. Gonzales*, 443 F.3d 435, 437 (5th Cir. 2006)).

The BIA denied Rubio asylum because he failed to establish that his previous mistreatment rose to the level of past persecution or formed a well-founded fear of future persecution. After careful review, we conclude the record does not compel a different conclusion under the substantial evidence standard.

*Past Persecution*

An Immigration Judge determined the harms Rubio experienced at the hands of the colectivos "individually and in the aggregate, [did] not rise to the requisite level of severity necessary to constitute persecution, particularly when considering that these events took place [during] a nine-year period [where Rubio] was involved in opposing the government."

Rubio's challenge is twofold. First, according to Rubio, "both his testimony and the evidence were ignored or minimized" by the BIA "to discount the suffering he endured and the very real threats he faced." He argues that the BIA failed to consider the seriousness of his injury and the recovery required after being shot by the colectivos in 2015, unduly minimizing the event because he recovered without experiencing permanent physical damage. Citing persuasive caselaw, Rubio also contends that "th[e] series of events that happened to [him]" indicate a broader pattern of being targeted by state-associated forces.[2] In Rubio's view, his encounters with state-associated forces—being shot in the leg by the colectivos, being sprayed with tear gas during protests by the Venezuelan National Guard, and

---

[2] *See Kravenchvo v. Gonzales*, 158 F. App'x 322, 323 (5th Cir. 2005) (per curiam) ("In assessing past persecution, the adjudicator must consider the cumulative effect of an applicant's experiences.").

receiving threats of death—constitute past persecution when each event is viewed in isolation or considered cumulatively.

The Attorney General counters with three points in response. She emphasizes the sole instance of targeted physical harm Rubio experienced was when he was shot a decade ago and argues that the BIA appropriately considered that he fully recovered from his injury without any lasting physical damage, a permissible consideration when weighing whether an event amounted to sufficiently extreme conduct. She next stresses Rubio's only other experiences involving physical harm were when he was tear gassed in a crowd by authorities. Lastly, the Attorney General highlights that Rubio safely lived in Venezuela with "years-long lulls between incidents" and has traveled freely in and out of that country without issue as a political dissident.

The Immigration Judge, and the BIA, properly rejected Rubio's claim of past persecution. We previously held a single violent event where an applicant experienced physical harm because of his membership in a particular social group did not necessarily constitute persecution. *Eduard v. Ashcroft*, 379 F.3d 182, 187–88 (5th Cir. 2004) (being struck on the head with a rock once did not qualify as persecution). Neither did a physical assault by members of an opposition party followed by a death threat if the applicant refused to vote a certain way. *Gjetani*, 968 F.3d at 395–99.

In our court, even those subject to brutal physical attack are not necessarily victims of past persecution absent a showing of targeted and sustained attempts of harm. *See, e.g.*, *Venturini v. Mukasey*, 272 F. App'x 397, 402–03 (5th Cir. 2008) (per curiam) (no persecution when an individual was twice beaten by the Venezuelan National Guard and hospitalized for bruises, a broken rib, and trouble breathing from tear gas); *Rojas v. INS*, 937 F.2d 186, 188, 190 (5th Cir. 1991) (per curiam) (no persecution when an individual was "arrested, beaten and tortured" by the Nicaraguan Sandinistas). Other

courts agree. *See, e.g.*, *Reyes-Morales v. Gonzales*, 435 F.3d 937, 942 (8th Cir. 2006) (no persecution when an individual was beaten unconscious and left with "a physical deformity and several scars" while his "friend was also killed during this incident"); *Dandan v. Ashcroft*, 339 F.3d 567, 573–74 (7th Cir. 2003) (no persecution when an individual was kidnapped, detained for three days without food, and extensively beaten, resulting in facial swelling).

The events Rubio endured appear similar to those described in *Singh v. Barr*, 818 F. App'x 331 (5th Cir. 2020) (per curiam). Bikramjit Singh, a member of the minority Mann Party in India, was beaten twice—including once to the point of losing consciousness—and received death threats by members of the rival Badal Party. *Id.* at 332–33. But this court concluded Singh had not demonstrated he suffered the requisite level of harm to constitute persecution, even though he experienced physical injuries from violence on more than one occasion. *Id.* at 334.

By contrast, "a *sustained*, systematic effort to target an individual on the basis of a protected ground" can constitute past persecution. *Gjetani*, 968 F.3d at 397. The prototypical example is *Tamara-Gomez v. Gonzales*, 447 F.3d 343 (5th Cir. 2006). Henry Tamara-Gomez—a Colombian helicopter mechanic—accompanied Colombian National Police ("CNP") officers on a retrieval mission to recover the bodies of fallen CNP comrades killed in a remote jungle village by terrorists in the Fuerzas Armadas Revolucionarias de Colombia ("FARC"). *Id.* at 345. Shortly after the mission, Tamara-Gomez began receiving death threats against him and his family on his cell phone and then on his home phone. *Id.* at 346. Fearing for his family's safety, Tamara-Gomez moved away. *Id.* But within weeks, the threatening calls began again at his new house, along with demands for money in exchange for safety. *Id.* Ultimately, a bicycle bomb detonated in his new neighborhood, killing five individuals. *Id.* And all the while, FARC systematically hunted

down and executed Tamara-Gomez's retrieval team members and their families. *Id.*

The kind of extreme conduct in *Tamara-Gomez* involving "an organized, relentless campaign of intimidation, extortion, and murder," *Gjetani*, 968 F.3d at 398, is plainly not reflected in Rubio's case. Although Rubio indeed suffered physical violence as a political dissident, his experience appears more a series of standalone incidents than an organized, systemic, and sustained campaign against him.

As for the death threats levied at Rubio, this court has previously treated such threats "as a question of future—not past—persecution." *Qorane v. Barr*, 919 F.3d 904, 910 (5th Cir. 2019). Assuming they could establish past persecution, however, this court has observed that threats describable as "exaggerated, non-specific, or lacking in immediacy" do not constitute persecution. *Id.* (quoting *Corado v. Ashcroft*, 384 F.3d 945, 947 (8th Cir. 2004) (per curiam)). Both the colectivos' threat to kill him if he reported being shot and their threat to "burn [him] alive" lack immediacy because they happened years before he fled Venezuela and depend on Rubio committing some future action. The most recent threat Rubio cites, where a colectivos member shouted "we got you" mistakenly to his neighbor, is serious because it involved gunfire into the air. But the vague threat was uttered approximately six years ago to a third party who did not experience any physical harm.

Our court separately has recognized when "an alien has endured a threat or assault but has nevertheless chosen to stay in his home country for a period of time," the "choice to stay tends to weaken the claim of persecution." *Gjetani*, 968 F.3d at 399; *see also Panmesri v. Holder*, 313 F. App'x 723, 726 (5th Cir. 2009) (per curiam) (asylum denied where applicant stayed in Thailand for twenty years after alleged past persecution); *Diaz*

*Flores v. Ashcroft*, 104 F. App'x 418, 419 (5th Cir. 2004) (per curiam) (asylum denied where applicant stayed in Honduras for ten years after receiving death threats); *Hafiz v. Ashcroft*, No. 02–60526, 2003 WL 21356048, at *2 (5th Cir. May 29, 2003) (per curiam) (asylum denied where applicant waited seven years in Bangladesh before seeking relief).

Similar circumstances weaken Rubio's claim. He remained in Venezuela for two years after his first reported encounter with the colectivos, and he traveled to and from the United States on multiple occasions as he experienced the violence he construes as persecution before ultimately seeking asylum in 2019.

Rubio avers only that he sought asylum "when it finally became too much and he feared he was being actively pursued" as background conditions continued worsening in Venezuela. But the Immigration Judge concluded Rubio "did not believe he was being persecuted" during this time, a finding bolstered by evidence of his resumed participation each time he returned to Venezuela in the same form of political activity that led to his violent encounters with the colectivos.

Society indeed would likely regard the events Rubio experienced as "unfair, unjust, or even unlawful or unconstitutional." *Majd*, 446 F.3d at 595 (cleaned up). Given his positive credibility determination, there is little reason to doubt the sincerity of his account. But a showing of past persecution requires more.[3] *Id.*

---

[3] Because the BIA concluded Rubio failed to establish past persecution, it rendered him ineligible for humanitarian asylum. *Alvarado-Velasquez v. Sessions*, 722 F. App'x 365 (5th Cir. 2018) (per curiam), among other cases, support such a dispositive determination. *Id.* at 366. Rubio expends minimal effort briefing this issue on appeal, noting merely that "this relief should be reconsidered on remand." The issue therefore has not been briefed

No. 24-60392

*Fear of Future Persecution*

An alien can alternatively demonstrate a well-founded fear of future persecution by showing that "a reasonable person in [his] circumstances would fear persecution if [he] were to be returned to [his] native country." *Rangel*, 100 F.4th at 607 (quoting *Guevara Flores v. INS*, 786 F.2d 1242, 1249 (5th Cir. 1986)). To establish a well-founded fear of persecution, "an alien must have a subjective fear of persecution, and that fear must be objectively reasonable." *Eduard*, 379 F.3d at 189 (quoting *Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 445 (5th Cir. 2001)). An alien can establish a subjective fear of future persecution "in two ways—by showing others would target him for persecution or by showing a pattern or practice of targeting people like him." *Qorane*, 919 F.3d at 910. Then, to prove a subjective fear is objectively reasonable, an alien must show

> (1) he possesses a belief or characteristic a persecutor seeks to overcome by means of punishment of some sort; (2) the persecutor is already aware, or could become aware, that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and (4) the persecutor has the inclination to punish the alien.

*Cabrera v. Sessions*, 890 F.3d 153, 160 (5th Cir. 2018) (cleaned up). "[A]n applicant's fear of persecution cannot be *based solely* on general violence and civil disorder." *Eduard*, 379 F.3d at 190

The Immigration Judge determined that Rubio did not have a well-founded fear of harm first because he had not shown a subjectively genuine fear of future persecution. In so finding, the Immigration Judge observed that Rubio suffered the gunshot wound and was forced to move in July 2017 to

---

adequately, so he has waived it. *See Gurung v. Holder*, 587 F. App'x 834, 836–37 (5th Cir. 2014) (per curiam).

avoid being framed for the burning of his neighbor's home but gave weight to the fact that Rubio entered the United States twice after these incidents without filing an asylum application. The Immigration Judge reasoned that Rubio "did not believe he was being persecuted, nor did he fear future persecution" at the time, evidenced by his continued participation in political protests.

Additionally, the Immigration Judge found that any harm Rubio feared in the future was not objectively reasonable and would not be perpetrated on account of a protected ground. In reaching this conclusion, the Immigration Judge observed that "[a]lthough [Rubio] participated in some political activities over the years, the record evidence does not suggest that the Venezuelan government ever specifically identified him as an opposition leader, opposition politician, or significant opposition voice such that he would be targeted for persecution if returned to Venezuela." The BIA affirmed, noting that "the record did not suggest the Venezuelan government ever identified [Rubio] such that he would be targeted for persecution if he returned."

The Immigration Judge further noted that even though Rubio believed members of the colectivos had been seen in his neighborhood, they did not clearly identify themselves or who they sought to his neighbor. Emphasized too was the fact that Rubio "still owns his home in Venezuela" and that home "has not been vandalized by the colectivos, or seized by the [Venezuelan] government." Rubio's past ability to relocate to the nearby homes of family members indicated his ability to live outside his home—yet still within Venezuela—safely without a credible fear of being hunted down in the future. The BIA went a step further, rejecting Rubio's argument that "country conditions support the finding that all opposition members are at risk by the government and security forces."

No. 24-60392

Rubio argues as a threshold matter that the Immigration Judge failed to apply the proper test to determine if his subjective fear is objectively reasonable, contending "the [Immigration Judge] neither cited to nor discussed [the *Cabrera*] test in her decision and the BIA did not engage in any substantive analysis" of the four factors. He did not raise this issue before the BIA, so this court does not have jurisdiction to consider it. *Gjetani*, 968 F.3d at 397 ("Petitioners fail to exhaust their administrative remedies as to an issue if they do not first raise the issue before the BIA." (quoting *Omari v. Holder*, 562 F.3d 314, 318 (5th Cir. 2009))).

On substance, Rubio's challenge largely focuses on background conditions in Venezuela to show his fear of future harm is objectively reasonable. He emphasizes the dangers of being a "member of the opposition party" who "actively opposes the Maduro regime" because the government "targets political protestors." Presumably applying *Cabrera*, Rubio argues (1) the colectivos want to "stamp out and suppress" people who share his dissident political beliefs, (2) the government is aware of his beliefs because it photographed past protests he attended, (3) the government can punish him if it chooses, and (4) the government is inclined to suppress protestors like him based on unstable political conditions in Venezuela. Each of these arguments inextricably depends on a clear connection between the colectivos and the Venezuelan regime or the Venezuelan regime's hostility toward him.

Substantial evidence, however, supports the BIA's determination that Rubio failed to demonstrate his fear is subjectively well-founded and objectively reasonable.

As discussed, Rubio has been able to travel freely to the United States from Venezuela on multiple occasions. This court's nonbinding caselaw suggests that the ability to freely travel without experiencing detention, arrest, or harm undercuts the objective reasonability of an applicant's fear of

No. 24-60392

future harm. *Metreveli v. Garland*, No. 23-60171, 2024 WL 81573, at *1 (5th Cir. 2024) (per curiam); *Ndulu v. Lynch*, 643 F. App'x 345, 347–48 (5th Cir. 2016) (per curiam).

We give this proposition a boost of force. Rubio lived for years within an hour of his home without experiencing harm and could alternatively relocate elsewhere in the country because evidence indicates "the government is not looking for him." While those who had an interest in him have largely been confined to his neighborhood, the evidence fails to suggest he could not live safely and comfortably elsewhere in Venezuela. Further, Rubio's most recent encounter with the colectivos occurred six years ago, undercutting the threat they may pose to his safety upon return.

Finally, Rubio petitions this court for asylum based on harm he expects to experience by vowing to resume political activism against the Maduro regime if returned to Venezuela. Legitimizing such an argument would effectively enable *any* political dissident who opposes a regime antagonistic to its political opposition in their home country to qualify for asylum. Because this would unduly expand the scope of this extraordinary relief beyond what Congress contemplated, we emphatically reject it.

We ultimately find no reason that compels disturbing the BIA's determination that Rubio failed to present a well-founded and objectively reasonable fear of future persecution.

\* \* \*

Rubio has failed to show past persecution or demonstrate a well-founded fear of future persecution. He therefore is not entitled to asylum.

B

"Unlike asylum, withholding of removal is not discretionary." *Majd*, 446 F.3d at 595. An alien may not be removed to a particular country if it is

17

determined that "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). "To be eligible for withholding of removal, an alien must demonstrate an objective 'clear probability' of persecution in the proposed country of removal." *Majd*, 446 F.3d at 595 (citing *INS v. Stevic*, 467 U.S. 407, 413 (1984)).

Withholding of removal is a higher bar to clear than asylum. *Rangel*, 100 F.4th at 609. When an alien "does not meet the bar for asylum, he also does not meet the standard for withholding of deportation." *Efe v. Ashcroft*, 293 F.3d 899, 906 (5th Cir. 2002); *Ghotra v. Whitaker*, 912 F.3d 284, 288 (5th Cir. 2019) (describing the "more likely than not" standard for withholding of removal as "a higher bar than the 'well-founded fear' standard for asylum"); *Eduard*, 379 F.3d at 186 n.2 ("[T]he IJ's dismissal of Petitioners' asylum claims was dispositive of their withholding of removal claims.")

Rubio argues only that he succeeded in showing a clear probability of persecution to justify asylum, so therefore the immigration court erred in declining to withhold his removal. But because past persecution or a well-founded fear of persecution in the future is an essential component of a successful application for withholding of removal, *see* 8 C.F.R. § 1208.16(b)(1)–(2), the Immigration Judge did not err in denying Rubio's application.

Rubio therefore is not entitled to withholding of removal.

## C

An alien demonstrates eligibility for CAT relief by showing "(1) it is more likely than not that the alien will be tortured upon return to [his]

homeland, and (2) there is sufficient state action involved in that torture."[4] *Rangel*, 100 F.4th at 609 (cleaned up) (quoting *Tamara-Gomez*, 447 F.3d at 350–51). To meet this burden, "the alien may produce evidence of past torture, an inability to relocate to a safer part of the country, human rights abuses committed within the country, and any other relevant information." *Majd*, 446 F.3d at 595–96 (citing 8 C.F.R. § 208.16(c)(3)). An applicant must, however, prove more likely than not that any torture is "inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1); *Garcia v. Holder*, 756 F.3d 885, 891 (5th Cir. 2014). "[A]n official must be aware of the torture and take no action to protect the victim" to constitute consent or acquiescence. *Martinez-Lopez v. Barr*, 943 F.3d 766, 772 (5th Cir. 2019). In other words, the torture must take place "under color of law." *Garcia*, 756 F.3d at 892

Rubio argues as an initial matter that the BIA "committed legal error" by focusing on evidence of worsening background conditions to determine his likelihood of torture upon return to his homeland. In other words, Rubio claims that in considering the various evidence offered to determine his CAT eligibility, the BIA erroneously ignored all other possible types. He seems to view the four categories of evidence an "alien *may* produce," *Majd*, 446 F.3d at 595 (emphasis added), as considerations an immigration court *must* individually and exhaustively analyze when explaining its decision.

---

[4] "Torture is defined as any act by which severe pain or suffering . . . is intentionally inflicted on a person . . . for any reason . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1).

Rubio contends he offers all possible categories of evidence an alien may produce to show that "it is more likely than not that [he] will be tortured upon return to [his] homeland." *Rangel*, 100 F.4th at 609.

He first argues the BIA committed legal error by ignoring facts supporting "[e]vidence of past torture inflicted upon the applicant" as contemplated by 8 C.F.R. § 1208.16(c)(3)(i). He avers that the weight of evidence shows the colectivos would torture him upon his return to Venezuela, citing his past experiences "being shot and gassed" as "physical pain and suffering," in addition to receiving death threats. Second, Rubio argues he provided evidence to show he cannot relocate within Venezuela given his changed family circumstances. Third, identifying his status as a dissident in the fraught political environment, Rubio points to evidence showing "Maduro's regime" in Venezuela "has only tightened their grip on the country and that abuses, including extra-judicial killings occurred at national, state, and municipal levels." And finally, reiterating his intent to resume political activism if returned to Venezuela, Rubio avers that the risk of harm to him is particularized because "there is voluminous evidence of the continued and even increased targeting of all perceived opponents of the regime, including street-level protestors."

To start, our caselaw does not impose a mandatory duty for immigration courts to evaluate, and explain its reasoning in an exegesis, every category of evidence an "alien *may* produce." *Majd*, 446 F.3d at 595 (emphasis added). Even if it did, based on the record before us, "substantial evidence supports the agency's determination that [Rubio] failed to show that [he] would more likely than not be tortured by or with the acquiescence of a Venezuelan public official." Rubio "never had a warrant for his arrest," "has been freely able to depart and return to Venezuela," and his house "has not been seized by the government," facts that all suggest the Venezuelan government lacks interest in detaining or harming him.

Under the law's definition of torture, scant evidence suggests Rubio experienced it in the past. Nor does the record indicate a particularized risk of it in the future. The most compelling argument in Rubio's favor is the shooting he experienced, but it is the lone instance of targeted physical harm he endured, and it occurred a decade ago.

As for Rubio's claim that the immigration court improperly focused its reasoning solely on Venezuela's background conditions, we observe that the agency's analysis was seemingly in response to Rubio's rejected argument that "country conditions [can] establish anyone who is opposed to the government is likely to be tortured by the government." Our court further has emphasized that the BIA need not "write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Efe*, 293 F.3d at 908.

In its explanation, the BIA cites to multiple authorities for the proposition that generalized conditions in a country tell courts little about the particularized risk of torture to an applicant, including *Matter of S-V-*, 22 I. & N. Dec. 1306 (BIA 2000). There, the BIA noted that "[s]pecific grounds must exist that indicate the individual would be personally at risk" of torture. *Id*. at 1313. In evaluating Rubio's application, the BIA concluded he faces no specific and particularized risk of torture if returned to Venezuela.

We agree. Rubio is not entitled to CAT relief.

## IV

For the reasons detailed above, Rubio's petition for review is DENIED.